**L. B. WILSON, Inc. v. FEDERAL COM-
MUNICATIONS COMMISSION
(STANTON, Intervenor).**

No. 9434.

United States Court of Appeals
District of Columbia.

Reargued June 12, 1947.*

Decided April 12, 1948.

* Originally argued April 15, 1947, before Stephens, Clark and Wilbur K. Miller, Associate Justices; reargued by direction of the court before Stephens, Edgerton, Clark, Wilbur K. Miller and Prettyman, Associate Justices, June 11-12, 1947.

Mr. Paul Dewey Pinckney Spearman, with whom Messrs. Frank Roberson and Charles Russell Rowell, who entered appearances, were on the brief, for appellant.

Mr. Max Goldman, Atty., Federal Communications Commission, with whom Messrs. Benedict P. Cottone, Gen. Counsel, Harry M. Plotkin, Asst. Gen. Counsel, Paul Dobin, Atty., and Joseph M. Kittner, Atty., Federal Communications Commission, who entered appearances, were on the brief, for appellee.

Mr. George O. Sutton, with whom Messrs. John H. Midlen and William Thomson, who entered appearances, were on the brief, for intervenor.

Mr. Robert T. Barton, Jr., who was permitted to argue as amicus curiae, urged affirmance.

Before STEPHENS, EDGERTON, CLARK, WILBUR K. MILLER and PRETTYMAN, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a decision and order of the Federal Communications Commission of November 14, 1946, announced November 15, denying the petition of the appellant, L. B. Wilson, Inc., for reconsideration of the action of the Commission on May 10, 1946, granting without hearing the application of Patrick Joseph Stanton for a construction permit to erect a new standard broadcasting station. The question involved in the appeal is whether or not the appellant as an outstanding licensee claiming that objectionable interference within its protected contour will be caused its broadcasting station by the operation of the Stanton station, is entitled to a hearing before the Commission before decision by it on the Stanton application. The answer involves interpretation of the Communications Act, 47 U.S. C.A. § 151 et seq.

The appellant is the licensee of radio broadcasting station WCKY at Cincinnati, Ohio. Its license, authorizing it to operate on a frequency of 1530 kilocycles with power of 50 kilowatts unlimited time as a Class I-B clear channel station, was issued September 25, 1945. Stanton's application, filed January 21, 1946, was for a Class II station to operate at Philadelphia daytime only on the same frequency, 1530 kilocycles, as the appellant but with a power of 10 kilowatts. The Stanton application stated that the operation of his station would not cause objectionable interference to any existing station.[1] The Commission by order designated the Stanton application for hearing in a consolidated proceeding with the application for

---

[1] This statement was made pursuant to the requirements of Section 3.24(b) of the Rules and Regulations of the Commission and of the Commission's Standards of Good Engineering Practice (1. Engineering Standards of Allocation) which are in effect a part of the rules.

Section 3.24(b) of the rules provides: "An authorization for a new standard broadcast station . . . will be issued

a construction permit of the Allentown Broadcasting Company which was at the same time an applicant for a license to operate a broadcasting station upon the frequency 1540 kilocycles. The order specified that the hearing was "To determine whether the operation of the proposed station would involve objectionable interference with the service of any existing broadcasting stations, the nature and extent of any such interference, the areas and populations affected thereby, and the availability of other broadcast service to such areas and populations. . . . [and] To determine on a comparative basis, which, if any, of the applications in this consolidated proceeding should be granted." Notice of the hearing was published in the Federal Register on May 1, 1946 (Vol. 11, No. 85, p. 4739). On May 13, three days prior to the expiration of the period within which according to the Commission's rules[2] the appellant might do so, it filed a petition to intervene in the hearing alleging that objectionable and extensive interference would be caused to the appellant's station if the Stanton application should be granted and offering, if permitted to participate in the hearing, to show this interference, complete data on the area and population involved, and the duration of the interference. The petition was accompanied, pursuant to the requirements of Section 1.385 (now Section 1.388) of the Commission's rules, by the affidavit of an engineer in support of the allegation of objectionable interference.[3] But on May 10, 1946, and without the knowledge of the appellant, the Commission had withdrawn the Stanton application from the hearing docket and granted the same without hearing; and on May 23, 1946, without a hearing, the Commission dismissed the appellant's petition to intervene as moot. The appellant then, on May 29, 1946, which was within the requisite time,

---

only after a satisfactory showing has been made in regard to the following, among others: . . . (b) That objectionable interference will not be caused to existing stations . . . ."

The standards provide: "A Class II . . . station may be assigned to a channel available for such class, when a need therefor is shown . . . provided that no objectionable interference will be caused by it to existing stations . . . ."

The application form submitted to the Commission contained the question: "28 (d) State areas and number of persons residing within the present normally protected or interference-free contours of other stations to which objectionable interference may be caused by operation of the station as proposed by your application:" In response to that Stanton answered: "Objectionable interference will not be caused to any existing station."

2 Section 1.385 and Section 1.9.

3 Section 1.385 (now Section 1.388) provides that when the Commission has in designating a cause for hearing failed on its own motion under Section 1.384 (b) to name as a party any existing licensee who, if the application were granted, would suffer "electrical interference" within his normally protected contour as prescribed by the Commission's rules, such person is "permitted to participate in the proceeding by filing a petition to intervene showing that he comes within the provisions of Section 1.384(b)." Section 1.385 provides further that "Where the petition to intervene is based upon a claim that a grant of the application would cause electrical interference to an existing station . . . within its normally protected contour as prescribed by the applicable Rules and Regulations, the petition must be accompanied by an affidavit of a qualified radio engineer which shall show either by reference to the Commission's Standards of Good Engineering Practice or to actual measurements made in accordance with the methods prescribed by the Commission's Standards of Good Engineering Practice that electrical interference will be caused to the existing station . . . within the normally protected contour of the station.".

The engineering affidavit stated that "the Philadelphia operation would cause objectionable interference within the 0.5 mv/m ground wave contour of Station WCKY for approximately two hours following sunrise at Philadelphia and for approximately one hour preceding sunset at Philadelphia on the average. . . . [and] the ground wave service area of Station WCKY would receive limitations ranging from approximately 0.7 mv/m to 5 mv/m at the time of sunset in Philadelphia. The above considerations apply to primary service areas only; interference would also be caused to any skywave coverage produced by Station WCKY prior to sunset in Philadelphia. . . ."

pursuant to Section 1.387 (now Section 1.390(a) ) of the Commission's rules, filed a petition for reconsideration and rehearing of the order of May 10, 1946.[4] The petition alleged that as a Class I-B clear channel station the appellant is entitled to protection from objectionable interference within its 0.5 mv/m daytime contour and that the operation of the proposed Stanton station would cause objectionable interference within that contour and would thereby violate the Commission's rules and standards. Specifically the petition alleged that field intensity measurements taken on appellant's station by the Commission itself and lodged in the Commission's files show that there will be interference caused to the primary service area of the appellant's station by the proposed Philadelphia operation due to skywave interference for approximately two hours after sunrise and approximately one hour before sunset at Philadelphia and that the ground service area of the appellant's station will receive limitations ranging from approximately 0.7 mv/m to 5 mv/m at the time of sunset in Philadelphia, and that interference will be caused to any skywave coverage produced by appellant prior to sunset in Philadelphia. The petition for reconsideration was accompanied by and founded upon an engineering affidavit together with a graph showing in detail the duration of the alleged interference. The petition prayed that the Commission set aside the order of May 10 granting without hearing the application of Stanton and that it designate the application for hearing and make the appellant a party to the hearing or authorize it to intervene and participate fully therein. Stanton, in a so-called answer filed with the Commission, asserted that the interference claimed by the appellant, the existence of which Stanton

neither admitted nor denied, did not constitute objectionable interference within the meaning of the Commission's rules and standards. Without a hearing on the petition for reconsideration, the Commission denied the same by a decision and order of November 14, 1946, published November 15. In the decision and order the Commission stated that it "is of the opinion that the grant . . . [of the Stanton application] does not result in interference to petitioner's [appellant's] station WCKY . . . as defined by the Commission's Rules and Standards . . . ." Thereupon this appeal was taken.

I

Preliminarily it is to be noted that in cases such as the instant case, where an applicant for a new station license requests facilities the granting of which according to the contention of an outstanding licensee will cause objectionable interference to the latter's station within its protected contour under the rules and standards of the Commission, there are two critical issues. The first is whether or not such interference will be caused; the second, which arises contingently upon an affirmative answer to the first, is whether or not the public interest, convenience and necessity (hereafter for convenience referred to as public interest) require the allowance, by the Commission, of such interference. Each of these issues is critical for the public as well as for the private interests, for if as a matter of fact and law objectionable interference to the outstanding licensee will occur through the operation of the new station, not only will such licensee suffer economic injury but also his listening audience will be deprived of adequate service. It would, accordingly, *a priori* appear to be import-

---

[4] Section 1.387 (now Section 1.390(a) ) provides that "Where an application has been granted without a hearing, any person aggrieved or whose interests would be adversely affected thereby may file a petition for reconsideration of such action . . . within twenty days after public notice is given of the Commission's action in granting the application." The section provides further that such "petition will be granted if the petitioner shows . . . " that petitioner "is an ex-

isting licensee . . . and a grant of the application would require the modification . . . of his license . . . " or that "petitioner is an existing licensee . . . and a grant of the application would cause interference to his station within the normally protected contour as prescribed by applicable Rules and Regulations; or . . . " that a "grant of the application is not in the public interest."

ant in the administration of the Communications Act that a hearing be accorded by the Commission calculated to bring to its attention all relevent items of fact and law which might affect its decision on each of the two issues stated. That private as well as public interests are recognized by the Act is not to be doubted. While a station license does not under the Act confer an unlimited or indefeasible property right (Federal Communications Commission v. Sanders Bros. Radio Station, 1940, 309 U.S. 470, 60 S.Ct. 693, 84 L. Ed. 869)—the right is limited in time and quality by the terms of the license and is subject to suspension, modification or revocation in the public interest—nevertheless the right under a license for a definite term to conduct a broadcasting business requiring—as it does—substantial investment is more than a mere privilege or gratuity. A broadcasting license is a thing of value to the person to whom it is issued and a business conducted under it may be the subject of injury. We set forth in the margin quotations from decisions of the Supreme Court which support these statements and also provisions of the Communications Act itself which recognize that a broadcasting license confers a private right, although a limited and defeasible one.[5]

■ Preliminarily also the terms of Section 312 (b) of the Communications Act and a controlling judicial construction thereof are to be noted. The section reads:

Any station license after June 19, 1934, granted under the provisions of this chapter or the construction permit required hereby and after

---

[5] In Federal Communications Commission v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656, the Court recognizes at various points in its opinion the existence of a private right or interest in a station licensee while his license is outstanding. The Court states (referring to Sections 307(d) and 301 of the statute): "No license was to be 'construed to create any *right, beyond the terms, conditions, and periods of the license.*' . . . Necessarily, therefore, the subordinate questions of procedure in ascertaining the public interest, when the Commission's licensing authority is invoked—the scope of the inquiry, whether applications should be heard contemporaneously or successively, whether parties should be allowed to intervene in one another's proceedings, and similar questions—were explicitly and by implication left to the Commission's own devising, so long, of course, as it observes the basic requirements designed for the protection of *private as well as public interest.* . . . Thus, it is highly significant that although *investment in broadcasting stations may be large,* a license may not be issued for more than three years . . . ." (Italics supplied) (309 U.S. at pages 137, 138, 60 S.Ct. at page 439, 84 L.Ed. 656)

In Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 1933, 289 U.S. 266, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406, the Court said: "In granting licenses the Commission is required to act 'as public convenience, interest or necessity requires.' This criterion is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power. Compare N. Y. Central Securities Co. v. United States, 287 U.S. 12, 24 [53 S.Ct. 45, 77 L.Ed. 138]. The requirement is to be interpreted by its context, by the nature of radio transmission and reception, by the scope, character and quality of services, and, where an equitable adjustment between States is in view, by the relative advantages in service which will be enjoyed by the public through the distribution of facilities. In making such an adjustment *the equities of existing stations* undoubtedly demand consideration. . . ." (Italics supplied)

Section 301 of the Communications Act provides: "It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any *right, beyond the terms, conditions, and periods of the license.* . . ." (Italics supplied)

Section 309(b) (1) reads: "The station license shall not vest in the licensee any *right* to operate the station nor any *right* in the use of the frequencies designated in the license *beyond the term thereof* nor in any other manner than authorized therein." (Italics supplied)

Section 309(b) (2) provides: "Neither the license nor *the right granted thereunder* shall be assigned or otherwise transferred in violation of this chapter." (Italics supplied)

such date issued, may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with: *Provided, however, That no such order of modification shall become final until the holder of such outstanding license or permit shall have been notified in writing of the proposed action and the grounds or reasons therefor and shall have been given reasonable opportunity to show cause why such an order of modification should not issue.* [Italics supplied]

And the Supreme Court has ruled that modification (within the meaning of that word as used in the section quoted) of an outstanding license may occur not only directly, by virtue of literal change of its terms, but also indirectly, through extension to another station of broadcasting facilities which will cause interference to the outstanding station within its lawfully protected contour; and the Court has further ruled that the hearing provided for in the section quoted is required in respect of such indirect modification of an outstanding license as well as in respect of direct modification thereof. Federal Communications Commission v. National Broadcasting Co., Inc. (KOA), 1943, 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374, hereafter sometimes referred to as the KOA case. In that case station KOA at Denver was a clear channel station operating on a frequency of 850 kilocycles unlimited time. Station WHDH of Boston had a license to operate daytime only on the same frequency. It applied to the Commission for an increase in power and for authority to operate unlimited time. The Commission found that this would cause interference with KOA's broadcast in the eastern part of the United States in the night time—against which interference KOA as a clear channel station was under the rules of the Commission protected—and the Commission therefore, desiring to grant the increase of power to WHDH, changed the rules and granted the WHDH application, and this without according a hearing to KOA. The theory of the Commission was that the license was not modified within the meaning of the word as used in Section 312(b) of the Act unless the terms of the license as such were literally changed. The Supreme Court held, affirming a similar ruling by this court (National Broadcasting Co. v. Federal Communications Commission, 1942 76 U.S.App.D.C. 238, 132 F.2d 545), that this was too narrow a view—that to alter the rules so as to deprive KOA of what had been assigned to it, and to grant an application which would create interference on the channel given it, was in fact and in substance to modify KOA's license; that therefore Section 312(b) of the Act required that KOA should be accorded a hearing on the question whether the modification, i. e., the interference which would result from the operation of the WHDH station with increased power in the daytime, was required by the public interest.

It is to be noted, however, that in the KOA case the Commission had found that the increased facilities granted WHDH would cause interference against which KOA as a clear channel station was protected, and that the Supreme Court accepted that finding. The case therefore (in addition to its ruling that an outstanding license may suffer indirect modification) decides only, in respect of right to a hearing, that under Section 312 (b) the Commission must accord a hearing to an outstanding licensee on the second of the two critical issues stated above, i. e., on the issue whether, granting that objectionable interference will be caused the outstanding station within its protected contour by the extension of facilities to another station, the public interest requires the allowance, by the Commission, of such interference. The case leaves undecided the question whether the Commission must accord an outstanding licensee a hearing on the first of the two critical issues noted above, i. e., on the issue whether objectionable interference within its protected contour will be caused an outstanding licensee's station by the granting of requested facilities to another station, a hearing that is to say, on the issue whether the granting of the requested facilities will or will not result in an indirect modification of the outstanding license. The KOA case thus leaves unanswered the primary question in the instant case—whether the Commission must accord the appellant a

hearing on the issue of indirect modification *vel non* of the appellant's license by the granting of the facilities applied for by Stanton, i. e., the issue whether the operation of the Stanton station if the application is granted, will cause objectionable interference to the appellant's station within its lawfully protected contour. For convenience that issue is hereafter sometimes referred to as the issue modification *vel non* of the appellant's license. It is the contention of the appellant that on such issue a hearing must be accorded it by the Commission. It is the contention of the Commission that on such issue no hearing need be held. We turn now toward a solution of this problem.

■ The solution is not found in express terms in the Communications Act. Section 312(b) set forth above is silent on the question whether a hearing shall be granted by the Commission on the issue whether or not (indirect) modification of an outstanding license will be occasioned by the granting of requested facilities to a new station. The section does not in terms provide for such a hearing; neither does it in terms forbid it. The same is true of the Act as a whole. It must therefore be construed. We think that properly construed it contemplates a hearing on the issue stated. We reach this view upon the following grounds:

■■ First: In the construction of a statute its provisions should if possible be given a reasonable meaning. Unreasonable consequences should be avoided. Cf. United States v. American Trucking Associations, 1940, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345. It would give an unreasonable meaning to the Communications Act, in view of the purpose of the Act and of the Commission's duties under it, to construe it as not contemplating a hearing to an outstanding licensee on the question whether the extension of facilities to another station will constitute an indirect modification of his license. The purpose of the Act is to protect and promote the public interest in broadcasting, but the Act also, as pointed out above, recognizes the private interest of licensees. The Commission is to furnish expertise in the administration of. the Act. It would be unreasonable for Congress to deny a hearing to an outstanding licensee on the issue whether or not the extension of facilities to another station will cause objectionable interference within the protected contour of the outstanding license and thereby indirectly modify the same, but to accord a hearing, as the Act does (as construed by the Supreme Court in the KOA case), on the issue whether or not the public interest requires such modification. Each of such issues, as pointed out above, is of critical importance to both the private and the public interests. The Commission's expertise is needed fully as much for the determination of the one issue as of the other. And for the determination of each of these issues the Commission is equally in need of the presentation of evidence and argument.

■ Second: Nothing but unmistakable language will warrant such construction of a statute as will produce unequal operation thereof. As said in 50 Am.Jur., Statutes, § 372, "where the legislature has clearly laid down a rule for one class of cases, it is not readily to be supposed that; in the same act, a different rule has been prescribed for another class of cases within the same reason as the first." Cf. Metcalf v. Watertown, 1894, 153 U.S. 671, 683, 14 S.Ct. 947, 38 L.Ed. 861. To construe the Communications Act as not according an outstanding licensee a hearing on the issue whether or not extension of facilities to another station will indirectly modify the outstanding license through objectionable interference within its protected contour would result in unequal treatment of outstanding licensees as compared with applicants for new facilities. Under Section 309(a) of the Act an application for a station license cannot be rejected without a hearing. That section provides:

If upon examination of any application for a station license or for the renewal or modification of a station license the Commission shall determine that public interest, convenience, or necessity would be served by the granting thereof, it shall authorize the issuance, renewal, or modification thereof in accordance with said finding. *In the event the Commission upon examination of any such application does not reach such decision with respect thereto, it shall notify the applicant thereof, shall fix and give notice of a time and place for hearing thereon, and*

*shall afford such applicant an opportunity to be heard under such rules and regulations as it may prescribe.* [Italics supplied]

In view of this provision the Commission cannot decide, without according a hearing to an applicant for new facilities, that his proposed operation *will* constitute objectionable interference within the protected contour of an existing station and thereby indirectly modify the outstanding license and that public interest does not require this and that therefore the application for new facilities must be rejected. This being true the Act will apply unequally unless it is construed also to provide that the Commission cannot decide, without a hearing accorded to an outstanding station licensee, that the operation of the new station *will not* constitute objectionable interference within the protected contour of the existing station and *will not* thereby indirectly modify the license for that station and that therefore the application for the new facilities may be granted, in the public interest, without reference to their effect upon the existing station. Putting this otherwise, at the door of the Commission stand two persons. One is an applicant for a broadcasting license with designated facilities. Under Section 309(a) of the Act the Commission cannot deny his application without first according him a hearing on the question whether the public interest will be served by the granting thereof. The other is an outstanding licensee, opposing—upon the ground that the requested facilities will cause objectionable interference to his station within its protected contour and thereby modify his license—the granting of the facilities sought by the applicant. If the Act is construed as providing that the Commission can overrule the opposition of the outstanding licensee without first according him a hearing on the merits of his opposition, then the Act will operate unequally as between the two persons standing at the Commission's door. No language in the Act requires such a discriminative construction.

Third: Administrative construction thereof by the Commission itself recognizes that the Act contemplates according a hearing to an outstanding licensee upon the question whether or not the granting of requested facilities to another station will indirectly modify the outstanding license by causing objectionable interference within its protected contour. This is evidenced by Section 1.385 (now Section 1.388) of the Commission's rules printed in footnote 3 above, providing that when the Commission has in designating a cause for hearing failed on its own motion under Section 1.384(b) to name as a party any existing licensee who, if the application were granted, would suffer "electrical interference" within his normally protected contour as prescribed by the Commission's rules, such person is "permitted to participate in the proceeding by filing a petition to intervene showing that he comes within the provisions of Section 1.384(b)." It is evidenced further by Section 1.387 (now Section 1.390(a)) of the rules printed in footnote 4 above, providing that "Where an application has been granted without a hearing, any person aggrieved or whose interests would be adversely affected thereby may file a petition for reconsideration of such action . . . within twenty days after public notice is given of the Commission's action in granting the application," and providing further that such "petition will be granted if the petitioner shows . . ." that petitioner "is an existing licensee . . . and a grant of the application would require the modification . . . of his license . . ." or that "petitioner is an existing licensee . . . and a grant of the application would cause interference to his station within the normally protected contour as prescribed by applicable Rules and Regulations; or . . ." that a "grant of the application is not in the public interest." In short the Commission in its own rules providing for intervention by, and reconsideration at the instance of, an outstanding licensee in the circumstances of the instant case, has construed the Act as requiring a hearing. And again by its order issued in the instant case designating the Stanton application for hearing and specifying that the hearing was "To determine whether the operation of the proposed station would

involve objectionable interference with the service of any existing broadcast stations, the nature and extent of any such interference, the areas and populations affected thereby, and the availability of other broadcast service to such areas and populations. . . . [and] To determine on a comparative basis, which, if any, of the applications in this consolidated proceeding should be granted," the Commission construed the Act as according a hearing to an outstanding licensee claiming objectionable interference by the operation of a proposed station. The Commission can hardly be heard to say that administrative remedies created by it are to be rendered abortive by denial of hearing to an existing licensee who seeks to pursue them.

Fourth: As said by the Supreme Court, "In the case of all acts of Congress, such interpretation ought to be adopted as, without doing violence to the import of the words used, will bring them into harmony with the Constitution. An act of Congress must be taken to be constitutional unless the contrary plainly and palpably appears." The Japanese Immigrant Case, Yamataya v. Fisher, 1903, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721. In that case it was contended that a Congressional act authorized an administrative officer to expel an alien without a hearing. But the Court concluded that "The words here used do not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power implied in the contention . . .." (189 U.S. at page 101, 23 S.Ct. at page 615, 47 L.Ed. 721) As above pointed out the Communications Act does not in terms forbid a hearing on the issue modification *vel non* of an outstanding license by the granting of broadcasting facilities to another station, although a hearing is not in terms provided for. The Act should, therefore, in order that it may be brought into harmony with the Constitution be construed to contemplate a hearing before decision by the Commission on the issue stated. As has been said above, a broadcasting license confers a property right on its owner, although a limited and defeasible one. The impairment of such

a right by the granting of conflicting facilities to another station is, therefore, *pro tanto* a deprivation of property. The due process clause of the Fifth Amendment provides that no person shall be deprived of life, liberty or property without due process of law. An essential element of due process is an opportunity to be heard before the reaching of a judgment. By due process of law is meant "a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial." Trustees of Dartmouth College v. Woodward, U.S.1819, 4 Wheat. 518, 581, 4 L.Ed. 629 (Webster's argument). As said in Galpin v. Page, U.S.1873, 18 Wall. 350, 368, 21 L.Ed. 959: "It is a rule as old as the law, and never more to be respected than now, that no one shall be personally bound until he has had his day in court, by which is meant, until he has been duly cited to appear, *and has been afforded an opportunity to be heard.* Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and never can be upheld where justice is justly administered." (Italics supplied) The Commission is not, strictly, a court, but it has quasi-judicial powers and its proceedings must satisfy "the pertinent demands of due process." Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 1933, 289 U.S. 266, 276, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406. For due process there must be an orderly proceeding in an appropriate and impartial tribunal; but due process is not necessarily judicial process; it may for some purposes be accorded by an administrative board or officer. Murray's Lessee v. Hoboken Land & Improvement Co., U.S.1855, 18 How. 272, 15 L.Ed. 372; Reetz v. Michigan, 1903, 188 U.S. 505, 507, 23 S.Ct. 390, 47 L.Ed. 563; The Japanese Immigrant Case, supra. It is to be observed in this context that if the Communications Act be said not to contemplate a hearing of due process character before the Commission, then it must be admitted, so far as its express provisions for hearings are concerned, to contemplate no such hearing at all on questions of fact because the pro-

ceeding provided for in this court is one in review "limited to questions of law" (Section 402 (e)). It is, moreover, obvious from the Act that Congress intended that such hearings as were to be held—other than in review—were to be held by the Commission. It can as truly be said of the Communications Commission as it was of the Federal Trade Commission in Federal Trade Commission v. R. F. Keppel & Bro., 1934, 291 U.S. 304, 314, 54 S.Ct. 423, 78 L.Ed. 814:

. . . It was created with the avowed purpose of lodging the administrative functions committed to it in "a body specially competent to deal with them by reason of information, experience and careful study of the business and economic conditions of the industry affected," and it was organized in such a manner, with respect to the length and expiration of the terms of office of its members, as would "give to them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience." [6]

Clearly the statutory scheme for administration of the Communications Act contemplates that the Commission shall apply its expertise in the exercise of its "primary jurisdiction" and that after this its decision shall have "administrative finality," i.e., shall not be open to review except upon "questions affecting constitutional power, statutory authority and the basic prerequisites of proof." Cf. Rochester Telephone Corporation v. United States, 1939, 307 U.S. 125, 140, 59 S.Ct. 754, 83 L.Ed. 1147. It is to be noted also that such hearings as are expressly provided for in Sections 309(a) and 312(a) and (b) of the Communications Act printed above are Commission hearings and that Section 409 (b) empowers the Commission to require by subpoena the attendance of witnesses, the production of books and papers, and that Section 409 (c), (d) and (j) gives the Commission the aid of the courts in case of disobedience of subpoenas. Finally, Section 409(e) provides for the taking of depositions in proceedings pending before the Commission. These provisions

sufficiently attest that it is the Commission, not this court, that is to hold such first instance hearings as the Act contemplates.

It is concluded, in summary of the foregoing, that if the Act be given a reasonable interpretation, an interpretation resulting in equal application, an interpretation in harmony with the Commission's own administrative construction, and an interpretation which will bring the Act into harmony with the Constitution, the Act must be held to contemplate hearings before the Commission on the issue modification *vel non* of an outstanding license by the granting of facilities to another station.

## II

It remains to discuss certain contentions of the Commission which it is asserted take the instant case out of the reach of the reasoning and conclusions set forth above and relieve the Commission from the duty of according the appellant a hearing.

The Commission contends that not every act of either a commission or a court must, as a condition to its validity, be preceded by a hearing. The Commission mentions, as examples of judicial acts which for practical and emergency reasons are performed without formal or oral hearing, the calendaring and assigning of cases, the granting of temporary injunctions to preserve the subject matter of litigation, the issuing of stay orders to preserve the *status quo* pending appeal. The foregoing may be admitted, but it is without force in the instant situation for we are not here concerned with an incidental or interlocutory act. Decision of the issue modification *vel non* of the appellant's license is a final decision by the Commission on the merits.

The Commission contends that the nature of the question before it was such that no hearing was requisite. It asserts

---

6 The Court in making this statement relied upon the legislative history of the Federal Trade Commission Act, 38 Stat. 717, Act Sept. 26, 1914, as shown in the report of the Senate Committee on Interstate Commerce, S.Rep. No. 597, 63rd Cong., 2d Sess. (1914) 9, 11. But the legislative history of the statutes by virtue of which the Communications Commission came into existence is on a parity in this respect with that of the Federal Trade Commission Act. (S.Rep. No. 772, 69th Cong., 1st Sess. (1926) 3; 67 Cong. Rec. (Part 11), 69th Cong., 1st Sess. (1926) 12353)

that what the Commission had to decide was whether or not, under the allegations, assuming their truth, of the appellant's petition for reconsideration describing the appellant's licensed facilities and the effect thereon of the proposed operation of the Stanton station, the interference charged was "objectionable interference" against which the appellant is protected under the Commission's rules and standards. The Commission, so the argument appears to run, is cognizant of its own rules and standards and may determine their meaning *ex parte*, leaving any hearing on this question of law to an appeal. We think this contention not supportable for the following reasons:

The contention over-simplifies the question presented to the Commission: It is true that the petition for reconsideration alleges in essence that skywave daytime interference will be occasioned by the operation of the Stanton station and that the Stanton answer states that "The interference claimed by . . . [the appellant] is neither admitted nor denied by this permittee [Stanton] and is not considered as objectionable interference within the meaning of the term as prescribed by the Commission's Rules and Standards of *Good Engineering Practice* applicable to this matter." Superficially, this may be said to raise only a question of law, as if upon a demurrer to the petition for reconsideration, as to the meaning of the Commission's rules and standards in respect of "objectionable interference." Since the Communications Act by providing that "The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice" (Section 154 (j)), has freed the Commission from the so-called "technical rules of evidence and procedure" traditionally applied by courts, it is out of the ordinary for the Commission, in defense of its denial of hearing to the appellant, to seek refuge in such a common law "formality" as a demurrer. Nevertheless, we do not rule that the Commission may not, at the threshold of consideration of an issue modification *vel non* of an outstanding license by the proposed operations of another station, treat the petition asserting such modification as if upon demurrer and thereby avoid the necessity of hearing proof of the truth of the allegations of "objectionable interference" if as a matter of law they do not "show" such interference within the Commission's rules and standards. This may indeed be a sensible *pro tanto* adoption by the Commission of court practice. But in the instant case it was not feasible for the Commission to deal with the petition for reconsideration as if upon demurrer. It is the contention of the appellant not only that within the Commission's rules and standards when properly read skywave daytime interference is "objectionable interference" against which its station as a Class I-B clear channel station is protected, but also that if the rules and standards do not protect against such interference they are contrary to actual measurements made since 1937 and as late at 1944, i. e., physical data within the Commission's files, which the rules and standards require shall be considered, and also that if the rules and standards do not protect against daytime skywaves they are contrary to the North American Regional Broadcasting Agreement, 55 Stat. 1005 (1937), and hence in such particular void. Thus included within the "question of law" raised by these contentions is one of fact, to wit, as to the nature of the measurements or data in the Commission's files, and one of mixed fact and law as to the bearing of this data upon the meaning of the term "objectionable interference" as used in the Commission's rules and standards. Under common law practice the petition in its broad reference to "physical data" within the Commission's files might have been subject to a special demurrer for uncertainty, and under present rules of practice in the Federal courts to a bill of particulars to bring, so to speak, to the face of the petition the exact nature of the "physical data," so that all allegations of fact necessary to a full statement of the petitioner's claim of "objectionable interference" within its "protected contour" would be known for purposes of dealing with the petition as if upon demurrer. But special demurrers and bills of particulars are not indulged in by the Commission's rules of practice. Therefore a hearing was

requisite to bring to attention, for purposes of dealing with the appellant's petition for reconsideration, the actual measurements, the "physical data" in the Commission's files, submerged in the general reference thereto in the petition.

 It is to be noted further that, even if the petition for reconsideration in the instant case is sufficiently specific in its allegations to be dealt with as if upon demurrer, the Commission's contention incorrectly assumes that a demurrer can be disposed of without a hearing. A demurrer at the common law (or a motion to dismiss, the substitute in present Federal court practice for the demurrer) is not a mere procedural nicety. On the contrary it is a precise instrument for final determination on the merits of the justiciability under pertinent rules of law of an asserted cause of action or defense. Sustaining a demurrer puts the party against whose pleading it is directed permanently out of court—unless he is allowed to amend and can amend. Overruling a demurrer sets the machinery of the court in motion and puts the parties to their proof. It is not only not the practice of courts at the common law, or indeed under the modern codes, to make disposition of demurrers without a hearing, but also no such practice would under the Constitution be supportable. The due process guarantee of hearing draws no distinction between questions of law and questions of fact. Due process requires not only opportunity for the presentation of evidence and the cross-examination of witnesses but also opportunity for argument. Londoner v. Denver, 1908, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103; Morgan v. United States, 1938, 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129; Erie R. Co. v. Paterson, 1910, 79 N.J.L. 512, 76 A. 1065. As said in Londoner v. Denver, where a state legislature committed the administration of a tax to a local board which enacted an ordinance of assessment allowing landowners an opportunity to file complaints and objections but no opportunity to be heard thereon:

. If it is enough that, under such circumstances, an opportunity is given to submit in writing all objections to and complaints of the tax to the board, then there was a hearing afforded in the case at bar. But we think that something more than that, even in proceedings for taxation, is required by due process of law. Many requirements essential in strictly judicial proceedings may be dispensed with in proceedings of this nature. But even here a hearing in its very essence demands that he who is entitled to it shall have the right to support his allegations *by argument* however brief, and, if need be, by proof, however informal. Pittsburg &c. Railway Co. v. Backus, 154 U.S. 421, 426 [14 S.Ct. 1114, 38 L.Ed. 1031]; Fallbrook Irrigation District v. Bradley, 164 U.S. 112, 171 [17 S.Ct. 56. 41 L.Ed. 369] *et seq.* . . . [Italics supplied] [210 U.S. at page 386, 28 S. Ct. at page 714, 52 L.Ed. 1103] [7]

The contention of the Commission that it could properly decide the issue before it without a hearing, leaving any hearing to an appeal ignores the respective positions and functions of the Commission and this court in the statutory scheme for administration of the Act. It is true that this court has power under Section 402(e) to rule on questions of law. But as has been indicated above in another context, its rulings are in review, not in the first instance. The Commission is first, in the exercise of its primary jurisdiction, to apply its expertise and make a "full statement in writing of the facts and grounds for its decision as found and given by it . . . ." (Section 402(e))[8] Administrative tribunals must, in the nature of

---

[7] In Morgan v. United States, cited in the text, the Court said: "But a 'full hearing'—a fair and open hearing—requires more than that. The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command." (304 U.S. at pages 18, 19, 58 S.Ct. at page 776, 82 L.Ed. 1129)

[8] It is to be noted that there is in the instant case no statement which adequately complies with this requirement. There is in the record the Commission's "Decision and Order on Petition for Reconsideration." This recites the allegations of the appellant's petition for reconsideration and of the Stanton answer and recites the rules and standards of the Commission as providing that the primary service area of a Class I-B clear chan-

their functioning, make decisions on questions of law in the first instance. They cannot reach decisions without applying to the facts they find the law governing their action; and to apply the law they must first determine what it is. Cf. United States v. Louisville & N. R. R., 1914, 235 U.S. 314, 320, 321, 35 S.Ct. 113, 59 L.Ed. 245; Rochester Telephone Corporation v. United States, 1939, 307 U.S. 125, 136, 59 S.Ct. 754, 83 L.Ed. 1147; 1 Vom Baur, Federal Administrative Law § 73 (1942). Nothing in the Communications Act or in any judicial construction thereof of which we are aware indicates that it was the intention of Congress that the Commission should exercise its primary jurisdiction on questions of fact only, and not on mixed questions of fact and law or questions of law alone. We think the Act, rightly viewed, contemplates hearings by the Commission in the first instance on all such questions.

■ The Commission contends, finally, and makes elaborate argument to the effect, that its decision that the operation of the Stanton station would not cause objectionable interference to the appellant's station within its lawfully protected contour is a correct decision and should therefore, notwithstanding that it was reached without a hearing, be affirmed. The contention again ignores the distinct, though correlative, functions of the Commission and this court under the statutory scheme—amply explained above. Until the Commission has upon a hearing in the exercise of its primary

nel station daytime is entitled to "protection from objectionable interference up to its 0.1 mv/m contour." And it recites that the Commission has also recognized "that conditions of radio wave propagation permit operation on such clear channels by stations denominated as Class II, under conditions which do not allow objectionable interference (i. e. within the protected contours established for day and night primary service) with the so-called 'dominant' clear channel station." Then the decision. proceeds as follows:

"Petitioner's complaint is that the operation of the proposed Stanton station at Philadelphia will result in skywave interference to Station WCKY, Cincinnati, Ohio, during a period following sunrise and preceding sunset. The Commission's Rules relating to protection of *daytime* contours of Class I-B stations do not take cognizance of nor afford protection against skywave interference for the reason that such waves are not reflected effectively back to earth during the day. The skywave curves which are a part of the Commission's Standards are based upon extensive measurements of skywave signals produced by broadcasting stations under varying conditions and at various seasons of the year. In 1935, at the time these measurements were taken and other scientific studies made, they indicated that such skywave signals as there were, were of very low order, and hence were considered of so little importance that the Standards of the Commission took no cognizance of daytime skywave propagation at broadcast frequencies. The periods of diurnal change are, however, very uncertain and erratic in their effect on radio wave propagation. On some days in the periods immediately before and after sunrise and sunset, skywaves may be reflected into areas which on other days, in the same periods of time, receive no such signal. In this state of the radio art, therefore, it is virtually impossible and the Commission believes it would be unreasonable to define 'daytime' operation in terms as unstable, erratic and uncertain as the conditions of radio wave propagation at sunrise and sunset.

"Accordingly, the Commission is of the opinion that the grant to Patrick Joseph Stanton, Philadelphia, Pennsylvania, does not result in interference to petitioner's station WCKY, Cincinnati, Ohio, as defined by the Commission's Rules and Standards, and hence It is Ordered, This 14th day of November 1946, that the said petition of L. B. Wilson, Inc. (WCKY), Cincinnati, Ohio, for reconsideration Be, and It is Hereby, Denied."

The foregoing, it will be noted, contains no express finding or ruling that the Commission's rules and standards do not protect against daytime skywave interference to a Class I-B clear channel station. Only by inference is this to be learned from the decision. There is no finding as to what are the actual measurements made since 1937 and as late as 1944, i. e., physical data in the Commission's files, and no conclusion as to the effect of such data on the Commission's rules and standards, and there is no conclusion on the question of the effect of the North American Regional Broadcasting Agreement on the Commission's rules and standards. The absence of findings and rulings on these questions is obviously for the reason that the Commission had not held a hearing upon them.

jurisdiction applied its expertise to the question presented by the appellant's petition for reconsideration and has, after such hearing, made its decision and filed with the court a full statement in writing of the facts and grounds for its decision, the question of the correctness thereof is not properly before this court. *"Qui aliquid statuerit parte inaudita altera, aequum licet dixerit, haud aequum fecerit.* He who decides anything, one party being unheard, though he should decide right, does wrong. 6 Co. 52; 4 Bla. Com. 483." 2 Bouv.Law Dict., Rawle's Third Revision, 1914, p. 2157.

The order of the Commission is reversed and the case remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

EDGERTON, Associate Justice, concurs in the result.

PRETTYMAN, Associate Justice (concurring).

I concur in the result in this case. The appellant asserted a threatened invasion of its license rights, i. e., objectionable interference within its protected contour area. The facts as alleged raised substantial and serious legal questions under the Commission's Rules and Regulations and Standards and under the North American Treaty, as pointed out in the opinion of the court. Under the scheme of procedure laid down in the Communications Act, appellant was entitled to be heard by the Commission upon those questions before this court is called upon to review the Commission's disposition of the matter. Also, I agree that due process of law in the disposition of a petition to intervene requires a hearing in the form of an oral argument when the facts alleged in the petition raise a substantial question of law as to petitioner's rights in the principal proceeding. As the Supreme Court said about oral presentation of evidence,[1] so it is in respect to oral argument—it is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the argument and to reach his conclusions uninfluenced by extraneous considerations.[2]

"Due process of law" is not a term of fixed content. It may vary as circumstances vary. The Supreme Court has held that in some situations written argument is sufficient to comply with the requirement for a hearing,[3] but that in other circumstances oral hearing is necessary.[4]

We are considering due process of law in the disposition of a petition for intervention—not due process in the principal proceeding. The requirements of due process vary as the situation presented by the petition varies. Moreover, due process may be afforded in orderly steps. Thus, the legal sufficiency of the allegations of fact in the petition may be tested before it is necessary to test the truth of the allegations. Such is the regular procedure of courts.

Sometimes these petitions present questions of law, sometimes questions of fact, sometimes both, and sometimes no question is presented because the alleged facts, taken as true, do not indicate under any legal concept that any right of the petitioner is involved in the proceeding. If the facts alleged in a petition clearly show that rights of the petitioner are involved in the principal proceeding, the petition cannot be denied without a hearing in which the petitioner has an opportunity to prove those facts. If the facts are disputed but there is also a question of law as to whether, even if the facts be true, petitioner's rights are involved, the petition cannot be denied without a hearing upon the legal question; that hearing may consist of an oral argument

---

[1] Morgan v. United States, 1936, 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288.

[2] This appellant did not request oral argument before the Commission on this petition, and under ordinary circumstances this might be sufficient to deny him that right. See Rules of Commission relating to Practice and Procedure, § 1.854 (c) and (d). But since this appellant was at all times demanding an oral hearing, although not on his petition, I think his right to one on the petition was adequately preserved.

[3] Morgan v. United States, supra note 1, 298 U.S. at page 481, 56 S.Ct. 906, 80 L.Ed. 1288. See also Johnson & Wimsatt v. Hazen, 1938, 69 App.D.C. 151, 99 F.2d 384; Mitchell v. Reichelderfer, 1932, 61 App.D.C. 50, 57 F.2d 416.

[4] Londoner v. Denver, 1908, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103.

upon the legal question alone; if it then appears that the alleged facts, if true, show petitioner's rights to be involved, the petition cannot be denied without further hearing upon the truth of the alleged facts. The latter composite supposition is the present case, and I agree that this petitioner had a right to an oral hearing upon the questions of law as to his rights raised by his allegations of facts, assuming the facts to be as alleged; and if his right be established upon the premise of the truth of his allegations, then his petition could not be denied without a hearing at which he could attempt to prove his facts.

But I do not agree with that portion of the opinion of the court which indicates that no matter what a petitioner for intervention says in his petition, he is entitled as of statutory and constitutional right to an oral hearing. It is my view that if, upon the facts as alleged in the petition, not even a substantial question, by dint of which petitioner would have a legal right involved, is raised, the petition can be denied without an oral hearing. In other words, a petitioner for intervention must allege some fact or facts which, if true, present a substantial legal question as to whether he has a right involved. The alleged facts must present an arguable question before petitioner has an enforceable right to argue. The protection of the Constitution must be invoked by allegations of fact. The question is not whether such a petitioner is entitled to the protection of the Constitution; everybody is so protected at all times. The question is what that protection consists of. The question is what due process requires when a petitioner for intervention in a pending proceeding does not allege any fact which, under any substantially conceivable theory of law, shows him to have a right involved. I think that such a petitioner has no right to require a hearing.