BROTHERHOOD OF RAILROAD TRAINMEN, Plaintiff,

v.

CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY (LINES EAST), and S. W. Amour, H. C. Birge and Kieran P. O'Gallagher, as Members of Special Board of Adjustment, Defendants.

Civ. A. No. 1641-64.

United States District Court
District of Columbia.

Oct. 23, 1964.

David Leo Uelmen, Milwaukee, Wis., Milton Kramer, Washington, D. C., Goldberg, Previant & Uelmen, Milwaukee, Wis., and Schoene & Kramer, Washington, D. C., for plaintiff and defendant H. C. Birge.

Francis M. Shea, Lawrence J. Latto, Richard T. Conway and Benjamin W. Boley, Washington, D. C., James P. Reedy, Chicago, Ill., and Shea & Gardner, Washington, D. C., for defendants Chicago, M., St. P. & P. R. Co. (Lines East) and S. W. Amour.

Michael J. Stack, Jr., Washington, D. C., for defendant Kieran P. O'Gallagher.

ROBINSON, District Judge.

This case presents for review another aspect of the controversy given birth more than a generation ago by the introduction of diesel-powered engines in rail transportation. The modern history of that controversy has been detailed in a recent opinion of this Court by Judge Holtzoff.[1] Only a few of the more relevant events need be recounted now.

On November 2, 1959, virtually all of the Nation's major railroads served notices[2] of proposed rule changes designed to eliminate firemen from freight and yard diesel engines and to reduce the size of crews in road and yard service. On September 7, 1960, five organizations, representing some 200,000 operating railroad employees, served counter-proposals which would have retained the firemen and maintained existing crew sizes. The magnitude of the issues and the consequences of continued disagreement engendered extraordinary governmental efforts to resolve the dispute.

On November 1, 1960, the President appointed[3] a commission which, after thirteen months of study, submitted recommendations which failed to produce agreement. To avoid a threatened nationwide strike, the President, on April 3, 1963, again acted[4] by establishing an emergency board[5] which was unable to mediate the dispute. After these and other efforts, also strenuous but unsuccessful, a general rail strike became imminent during the summer of 1963.

To avoid it, Congress adopted a Joint Resolution[6] on August 28, 1963, calling for compulsory arbitration of the fireman and crew consist issues. It created for this purpose Arbitration Board 282, composed in part of two carrier and two organization members. Board 282 rendered an award on November 26, 1963,[7] which later was upheld in an impeach-

1. Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q. R. Co., 225 F.Supp. 11, 13–17 (D.D.C.1964). See also Brotherhood of Locomotive Engineers v. Baltimore & O. R. Co., 372 U.S. 284, 83 S.Ct. 691, 9 L.Ed.2d 759 (1963) ; S.Rep. No. 459, 88th Cong., 1st Sess. 4–6 (1963), U.S.Code Congressional and Administrative News 1963, p. 833; H.R.Rep. No. 713, 88th Cong., 1st Sess. 2–3 (1963).

2. Pursuant to Railway Labor Act, § 6, 45 U.S.C. § 156.

3. Exec. Order No. 10891, 25 Fed.Reg. 10525 (1960), U.S.Code Congressional and Administrative News 1960, p. 1693.

4. Exec. Order No. 11101, 28 Fed.Reg. 3149–50 (1963), U.S.Code Congressional and Administrative News 1963, p. 1725.

5. Pursuant to Railway Labor Act, § 10, 45 U.S.C. § 160.

6. Pub.L. 88–108, 77 Stat. 132 (1963).

7. 41 L.A. 674–80 (1964). The award is hereinafter referred to as Award 282.

ment action filed in this Court.[8] That decision was affirmed by the Court of Appeals,[9] and the Supreme Court denied certiorari.[10]

This litigation is unaffected by the provisions of Award 282 pertaining to the dispute over firemen. The issues here originated when earlier this year the defendant carrier proposed reductions in certain yard and train crews. The provisions of the award bearing on the consist of such crews thus became prominent in this case.

*Award 282*

By denying the 1959–60 proposals of the carriers and the organizations on the arbitrated questions "except to the extent hereinafter provided," [11] the award relegated them exclusively to the remedies provided therein.[12] "The issue of crew consist (other than engine service)," it says, "shall be remanded to the local properties for negotiation." [13] "Pending the consummation of local

agreements disposing of the issue," those provisions regulate the use of affected crews.[14] It specifies [15] that

"No change shall be made in the scope or application of rules in effect immediately prior to the effective date of this Award, whether established by agreement, interpretation, or practice, which require a stipulated number of trainmen (assistant conductors, ticket collectors, baggagemen, brakemen, or flagmen) in any class of road service, including all miscellaneous and unclassified services, or which require a stipulated number of brakemen or helpers in any class of yard, transfer, or belt line service, including all miscellaneous yard services, except by agreement, or pursuant to the provisions of this Award."

The award particularizes the factors, denominated "guidelines," which are to govern any arbitration respecting rule changes.[16] Written notice of proposed

8. Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q. R. Co., supra note 1.

9. Sub nom. Brotherhood of Locomotive Firemen & Enginemen v. Certain Carriers etc., 331 F.2d 1020 (D.C.Cir.1964).

10. 377 U.S. 918, 84 S.Ct. 1181, 12 L.Ed.2d 187 (1964).

11. Award 282, § I, 41 L.A. 674–75 (1964).

12. Chicago, M., St. P. & P. R Co. v. Order of Railway Conductors & Brakemen, 229 F.Supp. 178, 179–180 (W.D.Wash. 1964).

13. Award 282, § III, pt. A, ¶ A(1), 41 L. A. 678 (1964).

14. Ibid.

15. Id. § III, pt. A, ¶ A(2), 41 L.A. 678 (1964).

16. General considerations are assurance of adequate safety; avoidance of unreasonable burden or workload on members of the crew; changes in operating conditions, including density of traffic; practices regarding the consist of crews in comparable situations where such practices are not in dispute; special conditions which exist on any particular assignment; duties required in compliance with the carrier's operating rules and in-

structions applicable to the crew in question; physical characteristics of the line to be traversed and in the areas where switching or industrial work is to be performed (including grade and general climatic conditions); the number of highway, street, road, railroad, or other crossings or intersections to be protected; state, county, or municipal regulations applicable with respect to highway, street, road, railroad, or other crossings or intersections; availability and use of communication equipment (such as, but not limited to, end-to-end train radio, train to way-side radio, and walkie-talkies); and the presence or absence of a fireman in the engine service crew. Particular considerations relative to passenger road service are the amount of baggage and storage mail to be handled on and off the train at intermediate stations by the train crew; the number of passenger cars handled in the train and passenger count; the method of handling passenger transportation (tickets); the number of passengers boarding and leaving the train at intermediate stations; and duties required other than the foregoing on any particular assignment. Particular considerations relative to freight service, including miscellaneous and unclassified services, are the amount and nature of work to be performed en route;

changes must be given and followed by "conferences between the representatives of the parties in interest with respect to such proposed change or changes." [17] Then,[18]

> "If no agreement is reached between the parties as to the application of the guidelines * * *, the dispute limited to the application of such guidelines as related to the issue involved may be referred by either party to a special board of adjustment."

Special boards of adjustment are to consist of three members two of whom may be partisans to the dispute.[19] In making their awards they are governed by the guidelines "although none of these factors alone shall be controlling of the board's decisions." [20] Awards must be rendered "within 60 days after the appointment of the neutral member," and "[a] decision of the majority of the board shall be binding upon both parties." [21]

The award also contains substantial safeguards against job termination to those employed on its effective date.[22]

the length of train, in context with the amount and nature of work to be performed en route; and time limitations applicable to the particular assignment. Particular considerations relative to yard, transfer · and belt line service and all miscellaneous yard services are the amount and nature of the work to be performed and the volume of work considered in context with applicable service time limitations. Id. § III, pt. C, 41 L.A. 679 (1964).

17. "Either party in interest shall give written notice of any proposed change in any such stipulated number of trainmen (assistant conductors, ticket collectors, baggagemen, brakemen, or flagmen) used in any class of road service, including all miscellaneous and unclassified services, in the following categories: (a) branch lines, including the use of main lines where necessary to reach initial or final terminals of the branch line train; and (b) road service where existing rule, practice or interpretation now requires the employment of more or less than 2 trainmen; and of any proposed change in any such stipulated number of brakemen or helpers used in any class of yard, transfer, or belt line service, including all miscellaneous yard service. The parties in interest, as that term is used in this Award, shall include only the carrier and the organization representing the class or craft of employees holding seniority rights to the position or positions proposed to be abolished or created in the seniority district or districts in which such changes are proposed. The time and place for the beginning of conferences between the representatives of the parties in interest with respect to such proposed change or changes shall be agreed upon within 10 days after the receipt of said notice, and said time shall be within 15 days after the receipt of

said notice." Id. § III, pt. A, ¶ A(3), 41. L.A. 678 (1964).

18. Id. § III, pt. B, ¶ B(1), 41 L.A. 678 (1964).

19. Each party in interest may name one member within ten days after notice that. the dispute will be referred to a special board. The two partisan members so chosen, within ten days after the date of the selection of the second partisan member, then name the neutral member, who becomes chairman of the board. If the members chosen by the parties fail to name the neutral member, the National Mediation Board is requested to do so. Id. § III, pt. B, ¶ B(2) (a), 41 L.A. 678 (1964). If either party fails to name a member, the Mediation Board is requested to name such member and also the neutral member. Id. § III, pt. B, ¶ B(2) (b), 41 L.A. 678–79 (1964).

20. Id. § III, pt. C, ¶ C(1), 41 L.A. 679 (1964).

21. Id. § III, pt. B, ¶ B(3), 41 L.A. 679 (1964).

22. Road trainmen and yard brakemen or helpers, other than those on furlough on the effective date of the award, are "protected employees." Id. § III, pt. D, ¶ D(1), 41 L.A. 679 (1964). Each such employee "shall retain his rights to and obligations to protect road and yard service assignments (including all assignments in miscellaneous and unclassified road services and all assignments in transfer, belt line, and miscellaneous yard services) for which he is qualified, as provided by rules in effect on the day preceding the day this Award becomes effective, to the extent that such positions are available to him in his seniority district, unless and until retired, discharged for cause, or otherwise removed from the carrier's active working lists

By its terms it is to continue in force for two years from its effective date unless the parties agree otherwise.[23]

*The Litigation*

On March 30, 1964, the defendant carrier mailed to the plaintiff organization two notices of contemplated reduction in crew consist on the carrier's "Lines East." One advised of a proposal to change from two to one the number of helpers on 162 assignments in 59 yards located in six states.[24] The other informed of its plan to eliminate baggagemen on seven trains operating between Milwaukee and Madison, Wisconsin, on the one hand, and Chicago on the other.

The organization promptly communicated its objections. Both notices, it said, were premature because its petition for certiorari, seeking review of the affirmance by the Court of Appeals of this Court's judgment upholding Award 282, had not then been acted upon. It contended that the yard crew notice covered too many assignments and too extensive an area of operation to permit appropriate consideration of the applicability of the award guidelines within a 15-day period,[25] and that a "full crew" law in Wisconsin made illegal any agreement to reduce the size of crews in that state. It also urged that the notice as to bag-

gagemen involved employees on passenger trains whose assignments were not a part of the train crew consist.

The parties commenced negotiations on April 15. After the organization's position on the baggagemen was then restated, the carrier referred the issue to a special board of adjustment for determination, and after four conferences on the crew consist issue during the ensuing two weeks failed to produce agreement, the carrier similarly referred that dispute.

The organization refused to name a member to the boards and requested instead a resumption of negotiations. The National Mediation Board rejected its protest against arbitration on the ground that the Board had no authority to interpret Award 282, and appointed organization[26] and neutral members for two boards of adjustment to decide the yard crew and baggageman disputes, respectively. Since these boards had the same membership, and throughout acted and were treated by the parties as a single unit, they will be collectively referred to as the Special Board.

The Special Board convened on May 25, held hearings from June 1 to June 29, and rendered awards on July 10 resolving all issues in favor of the carrier.

---

of road trainmen and yard brakemen or helpers by natural attrition; provided, that no such 'protected employee' shall have any right to jobs or positions that the carrier may discontinue pursuant to the provisions of this Award if other employment in any such classes of service, for which such employee is qualified, is available to him in his seniority district. If and when the carrier is required to create new jobs or positions for road trainmen or yard brakemen or helpers, pursuant to the provisions of this Award, such positions shall first be filled, to the extent available, by 'protected employees' then filling positions which the carriers would otherwise have the right to abolish or eliminate pursuant to the provisions of this Award, before such jobs or positions may be claimed by other employees of the carrier in accordance with their seniority rights." Id. § III, pt. D, ¶ D(2), 41 L.A. 679-80 (1964).

23. Id. § IV, 41 L.A. 680 (1964).

24. This notice also proposed a yard crew of one yard foreman and one helper where the crew is called for work train service employing an engine. All reductions would similarly obtain with respect to assignments subsequently established in lieu of, or performing substantially similar work as, the assignments enumerated in the notice.

25. Award 282 requires negotiating conferences to commence within 15 days after receipt of the notice. See note 17.

26. The General Chairman of the organization's Grievance Committee on the carrier's line was named originally. On June 17, the organization's Secretary of its General Committee on that line was substituted in his stead.

The organization now sues the carrier and the members of the Special Board for a declaration that the awards are void, and for an injunction to restrain the carrier from putting them into effect, urging several major premises. It complains that the carrier's notices of proposed reduction in yard and baggagemen crews included such a large number of different job assignments as to violate the terms and intent of Award 282. It contends that the carrier refused to negotiate in the manner contemplated by Award 282 with the result that arbitration was prematurely and improperly invoked. It contests the award as to baggagemen on the ground that the Special Board lacked jurisdiction over the issue as to them. It claims that the organization was denied a full and fair hearing by the Special Board in contravention of the Due Process Clause of the Fifth Amendment. It says, also, that the awards are void because the Special Board departed from the guidelines in reaching them. The Court, stating herein its findings of fact and its conclusions of law thereon,[27] holds that relief must be denied.

I

By its March 30 notice relative to the consist of yard crews, the carrier formally advised the organization of its proposal to change from two to one the stipulated number of helpers used in all classes of yard, transfer and belt line service, including all miscellaneous yard service, on 162 assignments specified therein. It also proposed that yard crews called for work train service using an engine consist of a foreman and a helper only, and that all planned reductions in yard crews be effectuated with respect to any assignments later established either in lieu of those listed or to perform substantially similar work. The assignments covered by this notice are performed in 59 yards situated in six different states. The other notice of even date proposed the elimination of baggagemen on seven enumerated train runs. Each notice suggested a conference to which the organization agreed without prejudice to its position.

During the period from April 15 to May 1, representatives of the carrier and the organization held four negotiation conferences throughout which there was sharp disagreement as to the proper scope and procedural course the discussions should follow. The organization, at the outset, took the position that the award left the assignment of baggagemen unaffected on the ground that these employees worked under a special agreement not involved in the crew consist rule. It also sought to eliminate consideration of any of the 57 assignments in Wisconsin in view of the "full crew" law of that state which precluded any change therein. The carrier expressed its conviction that the changes it proposed were justified by the guidelines of Award 282 and unsuccessfully sought indication by the organization as to the extent it would agree to them.

The carrier desired to negotiate by the process of applying the guidelines to employee groups classified according to the location of the yard in which they worked or according to the type of yard service they performed. The organization insisted that the parties deal with each of the disputed job changes individually in the light of the award guidelines. Since each had strong views, and neither would accede to the position of the other, no progress was made toward solution of this basic disagreement. During the discussions the organization's representative read extensively from questionnaires it had previously circulated and the carrier, in response to questions, similarly divulged data derived from time and motion studies it had made on the assignments in question.[28]

27. Federal Rules of Civil Procedure, Rule 52(a).

28. Between mid-February and early March, 1964, the carrier conducted time and motion studies of operations associated with the assignments in dispute and thereafter transmitted its notices of intended changes to the organization. Shortly after their receipt the organization obtained

The carrier frequently renewed its offer to negotiate on the number of changes that the parties might agree could be effected under the guidelines. It suggested that the matter might be disposed of if agreement to a substantial number could be reached. The organization, however, felt unable at any time before the conferences ended to consider possible areas of agreement on that basis.

In consequence of the organization's position on the baggageman dispute taken at the initial conference, the carrier promptly referred that issue to a special board of adjustment for decision. By May 1, the parties had discussed but 15 of the 162 assignments listed in the carrier's yard notice without reaching any agreement whatsoever. Shortly thereafter the carrier, feeling that no agreement would eventuate, invoked arbitration as to that dispute also.

The organization's claim that the notices do not harmonize with Award 282 is predicated upon the number and geographical location of the assignments the notices involved. It points to the provisions of Award 282 requiring that the parties confer within 15 days after receipt of notice [29] and that special boards of adjustment arbitrate unsettled controversies within 60 days after designation of the neutral member.[30] It contends that neither the recipient of the notice could within the 15-day period, nor a special board of adjustment within the 60-day period, give adequate consideration to so many different assignments. It urges that for these reasons the carrier's

notices were defective in the sense that they included an excessive number of assignments. But whether this is so is not immediately apparent from the language of Award 282. It contains no express limitation upon the number of operations which may be proposed for reduction nor does it answer the question whether the time limits it specifies are as inflexible as the organization supposes. If Award 282 restricts the subject matter of negotiation and arbitration in the manner assumed, it must be in consequence of an application which Board 282 intended but did not disclose.

■ Similarly, support for the organization's position on prematurity of arbitration is sought by reference to provisions of the Railway Labor Act requiring collective bargaining in labor disputes.[31] These, however, cannot be read as automatic incidents of Award 282. Three sections of the Act did apply to the activities of Board 282 itself, but that was because the Joint Resolution expressly so provided.[32] The obligations of the parties are now controlled exclusively by Award 282 [33] which does not expressly refer to the Act. Whether Award 282 incorporates any extrinsic statutory material depends upon the construction that should properly be placed upon what it says.

Award 282 remanded the crew consist issue "for negotiation" and established the substantive and procedural rules that would apply "[p]ending the consummation of local agreements disposing of the issue." [34] It commands "conferences"

information relative to the assignments through questionnaires transmitted to and completed by employees who were to be affected by the changes proposed.

29. Award 282, § III, pt. A, ¶ A(3), 41 L.A. 678 (1964).

30. Id. § III, pt. B, ¶ B(3), 41 L.A. 679 (1964).

31. See Railway Labor Act, § 2 First, Second, Ninth, 45 U.S.C. § 152 First, Second, Ninth. See also Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789

(1937); Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 721–722, 65 S.Ct. 1282, 89 L.Ed. 1886, n. 12 (1945); Rutland Ry. Corp. v. Brotherhood of Locomotive Engineers, 307 F.2d 21, 40–41 (2nd Cir. 1962), cert. denied 372 U.S. 954, 83 S. Ct. 949, 9 L.Ed.2d 978 (1963).

32. Pub.L. 88–108, § 4, 77 Stat. 132 (1963). See also notes 37 and 38 and related text.

33. See notes 11 and 12, supra, and related text.

34. Award 282, § III, pt. A, ¶ A(1), 41 L.A. 678 (1964).

**414**

between the parties [35] and, "[i]f no agreement is reached between the parties as to the application of the guidelines," authorizes arbitration of "the dispute limited to the application of such guidelines as related to the issue involved." [36] While clearly it contemplates some effort by the parties to resolve the difficulty, it does not particularize the activity required or provide a standard by which it can be measured to determine the sufficiency of the negotiations. Nor does it indicate whether or to what extent legislation in the railway labor field should play a part in the determination. Any attempt to test the carrier's conduct, then, must necessarily involve an undertaking to ascertain, with greater precision than possible by mere reading of Award 282, what Board 282 intended in this regard.

■■■ The Joint Resolution directed that, to the extent not inconsistent with its terms, "the arbitration [by Board 282] be conducted pursuant to" Sections 7 and 8 of the Railway Labor Act.[37] It further specified that the award be filed in this Court and "be subject" to Section 9 of the Act.[38] In this fashion it incorporated the explicit provisions of the Act governing the interpretation of arbitration decisions and made them mandatory features of the procedures and award of Board 282.[39] As a result, Board 282 is required to reconvene upon notice by the National Mediation Board that either party desires it "to pass upon any controversy over the meaning or application of their award," and to then consider such "questions relating to the meaning or application of the award" as the parties may submit.[40] Additionally, "any difference arising as to the meaning, or the application of the provisions, of" the award must "be referred back for a ruling to the same board." [41] The ruling,

35. Id. § III, pt. A, ¶ A(3), 41 L.A. 678 (1964).

36. Id. § III, pt. B, ¶ B(1), 41 L.A. 678 (1964).

37. Pub.L. 88–108, § 4, 77 Stat. 132 (1963).

38. Ibid.

39. The Joint Resolution provided that it would expire 180 days after August 28, 1963, the date of its enactment, "except that it shall remain in effect with respect to the last sentence of section 4 for the period prescribed in that sentence." Id. § 8, 77 Stat. 132 (1963). The last sentence of section 4 reads: "The award [of Board 282] shall continue in force for such period as the arbitration board [282] shall determine in its award, but not to exceed two years from the date the award takes effect, unless the parties agree otherwise." Id. § 4. Consequently, the Joint Resolution remains effective as to and for the life of Award 282 and with it the provisions of Sections 7 and 8 of the Railway Labor Act which the Resolution made applicable to Board 282 and the provisions of Section 9 of the Act which the Resolution made applicable to Award 282.

The Joint Resolution provided that the award of Board 282 should not become effective until 60 days after its filing. Id. § 5, 77 Stat. 132 (1963). Award 282 was filed on November 26, 1963, and it has been judicially determined that it be-

came effective on January 25, 1964. Brotherhood of Locomotive Firemen & Enginemen v. Chicago, B. & Q. R. Co., supra note 1, 225 F.Supp. at 16; In re Certain Carriers etc., 231 F.Supp. 519, 520 (D.D.C.1964).

40. "Upon notice from the Mediation Board that the parties, or either party, to an arbitration desire the reconvening of the board of arbitration (or a subcommittee of such board of arbitration appointed for such purpose pursuant to the agreement to arbitrate) to pass upon any controversy over the meaning or application of their award, the board, or its subcommittee, shall at once reconvene. No question other than, or in addition to, the questions relating to the meaning or application of the award, submitted by the party or parties in writing, shall be considered by the reconvened board of arbitration or its subcommittee. Such rulings shall be acknowledged by such board or subcommittee thereof in the same manner, and filed in the same district court clerk's office, as the original award and become a part thereof." Railway Labor Act, § 7, Third (c), 45 U.S.C. § 157 Third (c).

41. "The agreement to arbitrate—* * * (m) Shall provide that any difference arising as to the meaning, or the application of the provisions, of an award made by a board of arbitration shall be referred back for a ruling to the same

when acknowledged and filed in the same manner as the original award, becomes "a part of" and acquires "the same force and effect as such original award"[42] and, unless impeached, becomes "conclusive on the parties as to the merits and facts of the controversy submitted."[43]

■■ As a result of these clear mandates, it has been held that questions as to the meaning and application of the provisions of the award of an arbitration board created pursuant to the Railway Labor Act must be referred to the board for a ruling and will not be decided by the court.[44] From the circumstance that these statutes were made applicable to Board 282 follows the conclusion that construction problems under Award 282 must travel the same path. This Court has already pointed out that "if any questions of interpretation or construction of the terms of the award arise, they can be determined in the first instance by the Arbitration Board [282] and then by recourse to the Courts."[45] And squarely in point is the recent decision in Brotherhood of Railroad Trainmen v. Missouri Pac. R. Co.[46] There an injunction was sought against effectuation of awards rendered by special boards of adjustment created under Award 282. Among the grounds for the suit were contentions that the carrier's notices departed from the provisions of Award 282 and that adjustment boards had been established prematurely because the negotiations it required had not been conducted. The

Court denied relief, holding that it could not undertake to interpret Award 282. It said:[47]

"Thus, there has been judicial affirmation that Award 282 is final and binding and valid, even though therein likening it to an interlocutory decree, and so for our purposes the authority of the Local Board, its procedure, its findings and award, stemming as they do from Award 282 must be deemed to be a part of and embraced by Award 282, subject for its interpretation and application by reference to Board 282 as provided for by 45 U.S.C.A. §§ 157 (c), 158(m); such additional interpretations and applications of its award by Board 282 being judicially reviewable by 45 U.S.C.A. § 159 in the District Court of the District of Columbia under Public Law 88–108. * * * Whether the notices herein given were in accord with Award 282 are for Board 282's interpretation. * * * The local boards derive their sole authority from Award 282 and their responsibilities are determined entirely by Award 282. * * * Our analysis of plaintiff's grounds, heretofore outlined, for holding void the local awards has convinced us that the function plaintiff would have us perform is that of interpreting and applying Award 282 or of passing upon the validity of Award 282. We are

---

board, or, by agreement, to a subcommittee of such board; and that such ruling, when acknowledged in the same manner, and filed in the same district court clerk's office, as the original award, shall be a part of and shall have the same force and effect as such original award." Railway Labor Act, § 8, 45 U.S.C. § 158.

42. Ibid.

43. "An award acknowledged and filed as herein provided shall be conclusive on the parties as to the merits and facts of the controversy submitted to arbitration, and unless, within ten days after the filing of the award, a petition to impeach the award, on the grounds hereinafter set forth, shall be filed in the clerk's office of the court in which the award

has been filed, the court shall enter judgment on the award, which judgment shall be final and conclusive on the parties." Railway Labor Act, § 9, Second, 45 U. S.C. § 159, Second.

44. Western Air Lines v. Labor Commissioner, 167 F.2d 566 (9th Cir. 1948). See also Koelker v. Baltimore & O. R. Co., 140 F.Supp. 887 (E.D.Pa.1956).

45. In re Certain Carriers etc., 229 F.Supp. 259, 260 (D.D.C.1964). See also Order of Railroad Telegraphers v. New York Central R. Co., 181 F.2d 113 (2nd Cir. 1950), cert. denied 340 U.S. 818, 71 S.Ct. 48, 95 L.Ed. 601 (1950).

46. 230 F.Supp. 197 (E.D.Mo.1964).

47. 230 F.Supp. at 201–202.

not authorized by virtue of Public Law 88–108 to perform those functions. That Act gave such authority to interpret and apply its award to the Board it created, Arbitration Board 282, and made the District Court of the District of Columbia, the forum for impeaching it. Unless Arbitration Board 282 interprets and applies its own Award, deemed final on review by the forum designated for impeachment, we would have as many interpretations of that Award as there are district courts in the country, wending their way through Courts of Appeals to ultimate harmonious resolution in the Supreme Court of the United States. Such a procedure is not dictated by the language of Public Law 88–108 nor does it comport with reason in considering the finality contemplated by Public Law 88–108 in providing for an ultimate settlement for a limited period of time of a dispute which threatened the nation."

Board 282 has, in fact, been reconvened to resolve such problems. It has issued a number of interpretations one of which[48] bears vitally on the question at hand. Being informed that "[s]ome carriers are refusing to review with our committees the assignments covered by their notices, making no pretense of attempting to apply the guidelines of Part C of Section III" and asked

"Since the authority of the special boards of adjustment is restricted to 'disputes limited to the application of such guidelines as related to the issue involved,' are we correct in our understanding that the parties must attempt to agree upon the application of guidelines to the issues and that unless this attempt is made, no dispute is properly submissible to the special board?"

Board 282 answered:

"Under the terms of the Award it is expected that both parties will make an effort to resolve issues involving application of the guidelines. However, Section III, Part B, does not limit the right of either party to invoke the review procedure."

This construction is neither inconsistent with the Joint Resolution nor an unreasonable elucidation of the language of the involved provisions of Award 282. The judicial function as to the interpretation is thus exhausted at this point.[49] Moreover, Award 282, as so construed by Board 282, does not sustain the organization's contention that more was required than was done in this case before the disputes could be referred to the Special Board. Neither from Award 282 itself nor from what Board 282 has said it means can it be held on the evidence that arbitration was inaugurated too soon.

While Board 282 apparently has not construed its award as it may pertain to the number of assignments that may permissibly be noticed, a similar conclusion must be reached as to the organization's claim that the number here was excessive. Award 282 in terms imposes no such ceiling, and it is for Board 282 to say whether, properly interpreted, it is to have that effect. The organization may wish to obtain Board 282's construction and, if more needs to be said on the score of prematurity of arbitration, to seek a more favorable interpretation in that regard. But the fact that it may do either does not of itself justify the relief sought in this action.[50]

## II

The Joint Resolution referred to arbitration the unsettled matters incorporated in the carrier and organization notices

48. Board 282 Interpretation, B.R.T. Question No. 23, September 16, 1964.

49. See Radio Corporation v. United States, 341 U.S. 412, 420, 71 S.Ct. 806, 95 L.Ed. 1062 (1951); National Broadcasting Co. v. United States, 319 U.S. 190, 224, 63 S.

Ct. 997, 87 L.Ed. 1344 (1943); Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934).

50. In re Certain Carriers etc., supra note 45, 229 F.Supp. at 260.

of 1959–60 and prohibited changes in rules they embraced except by agreement or by the arbitration award.[51] It specifically directed adjudication of these matters and provided that the award "shall be binding on both the carrier and organization parties to the dispute and shall constitute a complete and final disposition of the aforesaid issues covered by the decision of the board of arbitration." [52]

The issue between the organization and the carrier as to train crew consist on the lines in question was incorporated in the notices.[53] The substantive and procedural criteria specified in Award 282 govern the disposition of all crew consist issues within the scope of the Resolution.[54] These apply to all proposed changes in "rules" which, "whether established by agreement, interpretation, or practice," undertake to "require a stipulated number of trainmen." [55] Baggagemen are within the definition of "trainmen," [56] and arbitral decisions are authorized under stated conditions.[57] The assignments here drawn into question thus fall literally within the language of Award 282.

Nevertheless, the organization contends for their exemption because of the fact and origin of a separate agreement which the carrier has with the baggagemen.[58] It also suggests the inapplica- bility of Award 282 by the claim that the carrier's rules do not require "a stipulated number of trainmen." The issue arises, then, not from any question as to whether there is an agreement between the parties, or as to the meaning of that agreement, but solely as to whether Award 282 applies to the resulting relation. The Special Board considered the jurisdictional objections and in the award under review expressed findings supporting its authority to act.[59] The organization produced no evidence, aside from the separate agreement itself, to sustain its challenge to that ruling.[60]

As the carrier's uncontradicted testimony shows, the agreement under which the baggagemen are employed, though separate, constitutes but a modification of its crew consist rule. Thus the baggagemen work under a "rule" which is "established by agreement" albeit one arising from different circumstances. And even considered as an independent arrangement, and apart from the Special Board's finding as to the size of train crews the carrier's rule requires, the separate contract on baggagemen itself discloses the parties' agreement that "the present number of baggagemen's jobs" continue on the train runs in question. In either event, then, what the carrier sought as to the baggagemen was change of a "rule" which was "established by

51. Pub.L. 88–108, §§ 1, 3, 77 Stat. 132 (1963).

52. Id. § 3.

53. See Hearings on S.J.Res. 102 Before the Senate Committee on Commerce, 88th Cong., 1st Sess., ser. 24, at 20–35, 145–154 (1963); Hearings on H.J.Res. 565 Before the House Committee on Interstate and Foreign Commerce, 88th Cong., 1st Sess., 17–32 (1963).

54. Chicago, M. St. P. & P. R. Co. v. Order of Railway Conductors & Brakemen, supra note 12, 229 F.Supp. at 180.

55. Award 282, § III, pt. A, ¶ A(2), 41 L.A. 678 (1964).

56. Ibid.

57. Id. § III, pt. B, ¶¶ B(1)–B(3), 41 L.A. 678–79 (1964).

58. The current agreement is evidenced by a memorandum dated July 1, 1958, which continues in effect an understanding reached November 20, 1936, by which the organization agreed to "waive the baggageman proposition" on the trains in question and the carrier agreed to "leave the present number of baggage jobs on in this territory" and to employ a disabled trainman.

59. The Special Board found that the carrier adhered to the agreement by retaining the disabled employee until his retirement in 1961, and that the carrier's current schedule specifies for passenger trains a crew consist of three one of whom is the baggageman.

60. See Philadelphia-Detroit Lines v. United States, 31 F.Supp. 188, 190 (S.D.Fla. 1939), aff'd 308 U.S. 528, 60 S.Ct. 384, 84 L.Ed. 446 (1940).

agreement" and which requires "a stipulated number of trainmen." Award 282 plainly applied to these assignments, and the carrier's proposal to alter them was properly before the Special Board.

### III

■ The Joint Resolution directed compulsory and binding arbitration of the crew consist issue and constituted Board 282 the vehicle for accomplishing this objective. Award 282, the arbitral result of the legislative mandate, established the substantive standards and procedural requirements for arbitration of such issues and constitutes special boards of adjustment a necessary and vital part of the machinery. In concretizing, through binding adjudications in compulsory proceedings, a function initiated by the Joint Resolution, they act under the aegis of Congress. The organization asserts here a claim of deprivation of the due process right to a full and fair hearing. The actions of the Special Board thus placed under attack bear vividly the imprimatur of government, and must withstand the test of the Fifth Amendment.[61]

■ The organization's challenge is rested upon a number of circumstances attendant upon the hearings of the Special Board. It says that it was denied a reasonable opportunity to prepare its side of the issues, that events occurring during the hearings curtailed its presentation, and that the awards are infected with bias. These are charges which merit careful investigation and evaluation of the facts in the light of constitutional requirements. While the Due Process Clause of the Fifth Amendment guarantees no particular mode of procedure,[62] it does require adequate notice of opposing claims,[63] reasonable opportunity to prepare [64] and to meet them [65] in an orderly hearing adapted to the nature of the case,[66] and a fair and impartial decision.[67]

61. Public Utilities Commission of District of Columbia v. Pollak, 343 U.S. 451, 461–462, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932).

62. Inland Empire Dist. Council etc. v. Millis, 325 U.S. 697, 710, 65 S.Ct. 1316, 89 L.Ed. 1877 (1945); National Labor Relations Bd. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 351, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); Louisville Gas & Electric Co. v. Federal Power Comm., 129 F.2d 126, 134 (6th Cir. 1942), cert. denied, 318 U.S. 761, 63 S. Ct. 559, 87 L.Ed. 1133 (1943).

63. Morgan v. United States, 304 U.S. 1, 18–20, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); California Co-Operative Canneries v. United States, 55 App.D.C. 36, 40, 299 F. 908, 912 (1924); E. B. Muller & Co. v. Federal Trade Comm., 142 F.2d 511, 518 (6th Cir. 1944); National Labor Relations Bd. v. Bradley Washfountain Co., 192 F.2d 144, 149 (7th Cir. 1951).

64. See Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); National Labor Relations Bd. v. Somerville Buick, Inc., 194 F.2d 56, 59 (1st Cir. 1952); National Labor Relations Bd. v. Algoma Plywood & Veneer Co., 121 F.2d 602, 604–605 (7th Cir. 1941); National Labor Relations Bd. v. American Potash & Chemical Corp., 98 F.2d 488, 492 (9th Cir. 1938), cert. denied 306 U.S. 643, 59 S.Ct. 582, 83 L.Ed. 1043 (1939).

65. Morgan v. United States, supra note 63, 304 U.S. at 18, 58 S.Ct. 773; L. B. Wilson, Inc. v. Federal Communications Comm., 83 U.S.App.D.C. 176, 185, 170 F.2d 793, 802 (1948); E. B. Muller & Co. v. Federal Trade Comm., supra note 63, 142 F.2d at 518. See Holden v. Hardy, 169 U.S. 366, 390, 18 S.Ct. 383, 42 L.Ed. 780 (1898).

66. E. B. Muller & Co. v. Federal Trade Comm., supra note 63, 142 F.2d at 518. See Ohio Bell Telephone Co. v. Public Utilities Comm., 301 U.S. 292, 304, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).

67. Amos Treat & Co. v. Securities & Exchange Comm., 113 U.S.App.D.C. 100, 103–105, 306 F.2d 260, 263–265 (1962); National Labor Relations Bd. v. Ford Motor Co., 114 F.2d 905, 909 (6th Cir. 1940), cert. denied 312 U.S. 689, 61 S.Ct. 621, 85 L.Ed. 1126 (1941); Inland Steel Co. v. National Labor Relations Bd., 109 F.2d 9, 20 (7th Cir. 1940). See In re

· *Opportunity for Preparation*

The carrier was ready to start the hearings on May 28, when the Board initially met. The organization, however, stated that it was not then prepared to proceed and requested time within which to prepare written submissions.[68] The neutral member,[69] concerned by the time limitations facing the Special Board,[70] felt that the hearings must proceed promptly and ruled that they commence on June 1. This the organization deemed to be too early.

The carrier had prepared written submissions which were available for presentation on June 1. The organization then had only copies of the questionnaires which it had prepared for affected employees and which had been answered by them in writing. These, the organization states, were intended for its own use in preparation and not for submission to the carrier or to the Special Board.

At the outset, the neutral member expressed his belief that the Board must work diligently if its task was to be completed within the mandatory time limit. To insure a flow of evidence in sufficient time to permit adequate consideration, he issued several directives to the parties. On June 8 he issued a written order, confirming an earlier oral directive, that all written materials related to crew consist be presented by June 26 and oral argument concluded by July 2. He later directed that written materials concerning such assignments in two divisions and two terminals be submitted by specified dates to enable their consideration in advance of the days upon which they were scheduled to be heard. After these assignments were not reached on schedule, he issued a written order on June 15 changing the submission dates as to them. This order also called for all written materials concerning work trains by June 19 and provided "that no written material shall be received by the Neutral respecting any of the assignments involved in this dispute subsequent to the close of the proofs thereon."

From the beginning to end the hearings followed a consistent procedural pattern. Yard crew assignments, which were considered first,[71] were called in the order listed in the carrier's notice. The parties introduced written material pertaining to the assignments then to be considered. The carrier submitted written narratives to which were appended its time and motion studies, and the organization presented copies of the questionnaires answered by its members. The carrier's witnesses, testifying first, were then examined by the carrier member and cross-examined by the organization member. The organization then presented witnesses who were examined by its representatives on the Special Board and cross-examined by the member representing the carrier.

At the end of the written and oral presentations upon particular assignments, the neutral member would ask the parties if they had anything further to submit. If the parties had nothing further to offer at the time, the neutral member would announce that the proofs

Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); National Labor Relations Bd. v. Pittsburgh Steamship Co., 337 U.S. 656, 659–660, 69 S.Ct. 1283, 93 L. Ed. 1602 (1949); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

68. A "submission" is a written statement of the facts, the party's position, and supporting argument. They are widely used at hearings by special adjustment boards in railway labor cases and customarily are exchanged by the parties in advance of the hearing.

69. See Note 19.

70. As stated before, such boards are required to render their awards "within 60 days after the appointment of the neutral member." Award 282, § III, pt. B, ¶ B(3), 41 L.A. 679 (1964). The neutral member here was appointed on May 18.

71. Hearings on these assignments occurred June 1–26. The baggageman assignments were heard June 29.

were closed on that particular assignment and the Special Board would proceed to the next.

Considerable evidence was presented by both sides. The carrier introduced 66 narrative submissions and five general exhibits. The organization presented copies of more than 400 of its questionnaires, and two narrative and two general submissions. The testimony was also extensive. That on the organization's behalf covered practically all of the assignments and as to some several witnesses testified. The organization's original member on the Special Board frequently testified to facts within his personal knowledge and also as an expert on a number of the issues.

During the course of the hearings, the organization made numerous requests for extensions of time to enable preparation of written submissions. These pleas were all rejected. On June 8 and 9 it addressed communications to the National Mediation Board by which it unsuccessfully endeavored to gain a revision of the time schedule. A request made June 11 to the carrier for a conference having in view a schedule more agreeable to it went unanswered. And on June 16 pleas for additional time were directed to the carrier and neutral members of the Board. The former flatly rejected the request and the latter pointed to his lack of authority to extend the time.

On June 15 the organization filed suit in the United States District Court for the Northern District of Illinois seeking an order extending the period within which the Special Board might function. This action was based upon an interpretation by Board 282 that its award authorized judicial extension upon a finding "that the request is justified under all the circumstances." [72] On June 17 the Court heard the application and

on June 22, without ruling on the merits, ordered that the case be transferred to this Court for determination. The file was transferred here on July 7 and was docketed July 10. The organization did nothing further in the litigation until after the awards of the Special Board were made.

Except for one brief recess, the hearings on yard crew assignments extended from 9:30 a. m. to 4:30 p. m. daily, five days a week, from June 1 to June 26. The baggageman assignments were heard on June 29. Even thereafter the organization sought more time for presentation. Its letter of July 1 advised that it intended to make a written submission on each assignment and on July 7 and 8 forwarded two additional exhibits. On July 7 the neutral member called a meeting for July 10 for the purpose of adopting awards and telephonically advised the organization that no additional evidence would be received. He testified, however, that he did in fact receive and consider all evidence it submitted up to the date of the awards.

That a sizable controversy over crew reductions on the defendant carrier's line might develop has been more than a small possibility since November 26, 1963, when Award 282 was announced. The General Chairman of the organization's Grievance Committee read the award soon after it was issued and knew that it took effect on January 25. The organization disclaims an expectation that the carrier would act except in a few instances where work was limited, and says that its first knowledge came when the March 30 notices were received. But the long history and intensity of the controversy forewarned that carriers would seek the economies the award made possible and suggested some consideration, much earlier than

---

72. "The time limit may be extended, however, by agreement of both parties. It may also be extended at the unilateral request of either party if a court of competent jurisdiction finds that the request is justified under all the circumstances.

The Award contemplates that substantial adherence to its objectives should outweigh literal compliance with the time limit." Board 282 Interpretation, B.R.T. Question No. 11, June 9, 1964.

March 30, of ways and means to resist reduction efforts.

The organization says that even when it received the March 30 notices, two months prior to the beginning of the hearings, it did not begin to prepare for a special adjustment board proceeding. There again no basis is apparent for the assumption that the issues would not proceed beyond negotiation. But a few days thereafter the organization sent to affected crew members its questionnaires seeking detailed information bearing upon the application of the guidelines to the changes proposed. An accompanying letter stressed the importance of responding to the questionnaires and urged that one be filled out for each day over at least a ten-day work period. This appeal was publicized by a newsletter distributed in April by the organization's Green Bay, Wisconsin, local admonishing yard foremen to detail their activities. While the organization claims they were designed only to permit it more knowledgeably to engage in negotiations with the carrier, the evidence does not suggest that this kind of preparation would not be useful for an arbitration proceeding.

The need to prepare for hearings became crystal clear when the carrier made known its decision to submit the issues to arbitration. On April 15 it stated that the baggageman disputes would be so referred and on May 1 made a similar announcement as to the yard crew disputes. The hearings did not commence until June 1 and the dates for submission were staggered over the ensuing period to June 29. Those for crew consist material were spread to June 26 and the baggageman assignments were not heard until June 29.

The organization's evidence does not sustain the conclusion that the circumstances it faced at the hearings precluded it from presenting any important facts to the Special Board which otherwise would have been a part of its case. Three of its officers, 18 local chairmen and a switchman testified in its behalf. There is no satisfactory showing that any additional witnesses would have testified had the time limits been larger. While its main emphasis is upon an alleged insufficiency of time within which to prepare submissions, its written presentation was nevertheless voluminous. And despite the rulings announced by the neutral member, his uncontradicted testimony is that he received and considered all evidence that was submitted up to the date of the awards.

While the organization endeavored constantly to persuade the Special Board to grant continuances, its complaint regarding their refusal gives too little weight to the fact that the Board functioned under a mandate to complete its task within a 60-day period which it had no power to extend. The rulings denying the continuances cannot be considered as having been inappropriate to insure a degree of progress that would keep the matter within safe range. And the organization did not exploit its opportunity to seek in this Court an extension of the period.

By judicial standards it is clear that the organization's opportunities for preparation were ample.[73] That Award 282 fixed a 60-day period for arbitration must be given weight as a highly qualified judgment that such a period is sufficient, at least in ordinary cases.[74] The organization's evidence furnishes no independent yardstick by which its claim

73. See Avery v. Alabama, supra note 64; National Labor Relations Bd. v. Somerville Buick, supra note 64; Locke v. United States, 166 F.2d 449 (5th Cir. 1948), cert. denied 334 U.S. 837, 68 S. Ct. 1495, 92 L.Ed. 1763 (1948); National Labor Relations Bd. v. American Potash & Chemical Corp., supra note 64.

74. The organization's claim that the proceeding embraced too many different assignments for the 60-day period to accommodate may be viewed also in the light of the experience of other special boards of adjustment functioning under Award 282. One considered 195 assignments in 14 days of hearings, and another dealt with 200 within an 11-day hearing period.

422

might be sustained, or disclose that it should not be tested by available criteria.

Whether the opportunity for preparation is reasonable depends upon an evaluation of all the relevant circumstances in the particular case. This is so for determination of a question of constitutionality no less than for decision of a matter lying in discretion.[75] On the one hand are the opportunities the organization had, the lack of demonstration that they were not ample, and the absence of a showing of prejudice. On the other hand are rulings of an arbitration body consistent both with its responsibilities and with any reliable standard discernible in the circumstances. Clearly, under such conditions, a deprivation of due process is not shown.

*Hearing Site*

At the first meeting of the Board the organization urged that the hearings be held on strictly neutral ground. It suggested as possibilities the neutral member's office, a hotel, and a hearing room at the National Railroad Adjustment Board in Chicago. The neutral member considered his own office inadequate, and was disturbed by the necessity for prearrangement or the prospect of expense incidental to use of other locations suggested. The carrier having offered its conference room in Chicago's Union Station without cost, it was decided that the hearings be held there.[76]

Special arbitration boards under the Railway Labor Act, the evidence reveals, usually conduct their hearings on the carrier's property. Some adjustment boards created under Award 282 have done likewise. A special board on the defendant carrier's line invariably hears cases in the same conference room in which the Special Board functioned. In reaching his decision the neutral member considered these customs, and as well the convenience of the site in the depot at which the organization's representatives and witnesses detrained upon arrival in Chicago for the hearings.

The organization argues, however, that the custom results from mutual understanding of the parties, and that other boards seldom hear live witnesses. It points to the quantity of oral testimony before the Special Board here and claims that the hearing site aroused in its witnesses a fear of reprisals. It says also that it was deprived of facilities wherein its witnesses might be privately interviewed and prepared.

These contentions do not withstand close scrutiny. The fact that the place for hearings is ordinarily a matter of agreement does not of itself establish the impropriety of a site upon the carrier's property. Aside from testimonial claim that the witnesses "just did not want to be there," there is nothing to show to what, if any, extent the organization was deprived of their testimony. Nor is there any indication that another hearing site, at which the carrier's representatives would have been present, would have relieved the apprehensions and inhibitions assumed. The organization never requested facilities in which to interview and prepare witnesses and it appears that had it done so they would have been provided.

It is well settled that adjudicatory bodies possess a broad discretion in fixing the place for hearings.[77] This discretion, of course, is not unlimited, and in a proper case may be overruled. The matter remains, however, one of discretion unless and until the proceeding is robbed of an element

75. See cases cited supra note 73.

76. The neutral member also thought the Railway Labor Act pointed to the carrier's property as the proper site and later issued a written award to that effect. In any event, he also employed the other factors mentioned in the text in selecting the carrier's conference room.

77. Southern Garment Manufactures Ass'n v. Fleming, 74 App.D.C. 228, 234, 122 F.2d 622, 628 (1941); National Labor Relations Bd. v. Southwestern Greyhound Lines, 126 F.2d 883, 887–888 (8th Cir. 1942); Gottlieb v. Schaffer, 141 F.Supp. 7, 18–19 (S.D.N.Y.1956).

essential to its fairness.[78] Neither abuse nor unfairness is shown here. The choice accorded well established custom, and did not hurt the organization.

### Lack of Transcript

The organization requested that a transcript be made of the evidence and proceedings at the hearings. The neutral member was agreeable provided the organization bore the expense. The carrier, in the belief that a transcript was unnecessary, never offered to share the cost, and no transcript was made. The neutral did, however, maintain extensive notes which he used as recollection aids in preparing the Board's award.

The evidence discloses that the National Railroad Adjustment Board, system boards of adjustment, and many special adjustment boards do not maintain transcripts of their proceedings. The judicial view is that, absent agreement, a written transcript of arbitration proceedings is unnecessary,[79] and this Court has said that no transcript need be made of those conducted pursuant to Award 282.[80]

### View

The organization requested the neutral member to schedule trips to job sites to observe some of the assignments that the carrier proposed to change. The neutral member denied these requests, even as to job locations within the Chicago area, preferring to reach the decision on the evidence presented at the hearings. It may well be that in particular cases arbitrators may and do gain a better understanding through first-hand knowledge obtained upon personal inspection of the activities under consideration. Yet the choice to view, or not to, is traditionally a discretionary matter, even where issues of fact must be decided by nonexpert juries,[81] and no basis is apparent upon which it may be held that the same discretion does not inhere in the arbitration function.

### Executive Board Session

The organization contends also that no executive session of the Special Board was held, and that this contributed to the unfairness of the hearings. But at the meeting convened for adoption of awards the neutral member read those he had written, entertained a motion for their adoption, and inquired as to whether the other two members were ready to vote. It appears that had either sought discussion, an opportunity therefor would have been afforded. No discussion was requested, however, and the vote was taken.

In an executive session, as the organization says, its representative on the Special Board might have discussed the assignments and argued his views to the others. The neutral member had scheduled the four-day period from June 29 to July 2 for argument on the crew consist issues which, however, they agreed to waive. What the result might be if no opportunity for oral argument had been afforded is a question which need not be considered.[82] Here it was

---

78. Gottlieb v. Schaffer, supra note 77, 141 F.Supp. at 19.

79. Bernhardt v. Polygraphic Co., 350 U.S. 198, 203–204, 76 S.Ct. 273, 100 L.Ed. 199, n. 4 (1956); Petition of Brink, 98 F.Supp. 135, 137–138 (E.D.N.Y.1951), aff'd Brink v. Pan American World Airways, Inc., 193 F.2d 1009 (2nd Cir.1952); Commercial Solvents Corp. v. Louisiana Liquid Fertilizer Co., 20 F.R.D. 359, 362 (S.D.N.Y.1957).

80. In re Certain Carriers etc., supra note 39, 231 F.Supp. at 521.

81. W. M. & A. Transit Co. v. Radecka, 112 U.S.App.D.C. 336, 339–340, 302 F. 2d 921, 924–925 (1962); Gunther v. E. I. Du Pont de Nemours & Co., 255 F.2d 710, 716 (4th Cir. 1958); Lowry v. Seaboard Airline R. Co., 171 F.2d 625, 627 (5th Cir. 1948).

82. In Federal Communications Comm. v. WJR, 337 U.S. 265, 276, 69 S.Ct. 1097, 1103, 93 L.Ed. 1353 (1949), the Court pointed out that "the right of oral argument as a matter of procedural due process varies from case to case in accordance with differing circumstances, as do other procedural regulations."

provided and neither party chose to utilize it.

■■■ Nor is it clear as to how it may be held that the Special Board could not employ to formalize its action the method which is commonplace in decision-making bodies and, from the evidence, is standard with special adjustment boards in railway labor disputes. It afforded each contestant a chance to discuss the proposed action, its evidentiary and legal bases, and to argue its own position.[83] Due process requires no more.

*Bias*

■■■ The organization also assaults the procedural fairness of the hearings with the charge that the neutral member was biased against it.[84] The evidence does disclose a few brief exchanges between the organization and neutral members which in total context were innocuous and indicate no predisposition as to the matters at issue. The events to which the organization points are overwhelmingly the rulings of the neutral member adverse to its position

and the ultimate decision in the carrier's favor on all assignments in dispute. But even the "total rejection of an opposed view cannot of itself impugn the integrity or competence of a trier of fact."[85] No ruling specifically complained of appears to have been erroneous,[86] and an overall view of the evidence refutes the claim that the neutral member was partial.[87]

Separately measured, the events upon which the organization predicates its constitutional contentions do not establish a deprivation of due process. Nor do they when considered collectively. The thrust of the organization's argument is that it is against the backdrop of its opportunities to prepare for the hearings that its other incidents are to be viewed. On this basis it says that it was then required to rely heavily on oral presentation, was handicapped by the hearing site, lack of a transcript and a view, and by what it considers to have been an absence of executive sessions of the Special Board. To what has already been said it need only be restated

83. In these circumstances, no legal violation is discerned in the neutral member's refusal to furnish the organization member with a copy of the proposed awards prior to the meeting. See In re Duluth, M. & I. R. Ry. Co., 124 F.Supp. 923, 928–929 (D.Minn.1954).

84. In its complaint the organization charges only that the neutral member was "not a neutral or impartial person as required by Section 5 of the Railway Labor Act." That section, 45 U.S.C. § 155, Third (a), requires the National Mediation Board to remove a neutral member of an arbitration board formed pursuant to Section 7 of the Act, 45 U.S.C. § 157, who is not "wholly disinterested in the controversy to be arbitrated and impartial and without bias as between the parties to such arbitration." However, as this Court has held, In re Certain Carriers etc., supra note 39, 231 F.Supp. at 521, those provisions are inapplicable to special boards of adjustment constituted under Award 282. The National Mediation Board apparently recognized this here when it declined to act upon the organization's complaint, made to it during the hearing, that the neutral member was

partial. Award 282 specifies that two of the three members of special boards of adjustment may be partisan to one or the other of the opposing views and also speaks in terms of the "neutral member." § III, pt. B, ¶¶ B(2) (a)–B(2) (c). Not only may it be assumed that the neutral member must be unbiased, but the circumstances relevant of record must be considered in connection with the organization's claim that it was denied procedural due process.

85. National Labor Relations Bd. v. Pittsburgh Steamship Co., supra note 67, 337 U.S. at 659, 69 S.Ct. 1283. See also Lloyd A. Fry Roofing Co. v. National Labor Relations Bd., 222 F.2d 938, 940–941 (1st Cir. 1955); National Labor Relations Bd. v. Robbins Tire & Rubber Co., 161 F.2d 798, 799–800 (5th Cir. 1947).

86. See National Labor Relations Bd. v. Acme-Evans Co., 130 F.2d 477, 482–483 (7th Cir. 1942), cert. denied 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. 1142 (1943).

87. The text statement is not intended to refer to the awards themselves for the Court expresses no opinion on the merits of the controversy. See Part IV hereof.

that the premise for the argument is erroneous.

 A due process challenge undoubtedly requires that all relevant circumstances be viewed as a totality. Each circumstance upon which the organization relies here is reasonably explained by its own concomitants, and together they are but an accumulation of constitutionally neutral events. "If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality." [88] An evaluation of the whole evidence disestablishes the claim that constitutional limits were exceeded here.

## IV

 In the complaint the organization alleges that the awards under attack failed to follow the guidelines established by Award 282. It is well settled, however, that a court will not review an arbitration award on its merits.[89] Though this is frequently so in consequence of an express statutory command, nothing is perceived in Award 282 which would warrant a departure from this salutary principle upon judicial review of an award made by a special board of adjustment created under it. Indeed, Award 282 confirms its operation by providing explicitly that "[a] decision of the majority of the board shall be binding upon both parties." [90] It is to the special boards of adjustment, and not to the courts, that the arbitral decision is committed, and the Court cannot trespass upon their domain by reviewing on the merits the disposition they have made.

For the reasons discussed herein, judgment will be entered in favor of the defendants.

88. Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942).

89. Barnett v. Pennsylvania-Reading Seashore Lines, 245 F.2d 579, 582 (3rd Cir. 1957); Ellerd v. Southern P. R. Co., 241 F.2d 541, 545 (7th Cir. 1957); Reynolds v. Denver & R. G. W. R. Co., 174 F.2d 673, 675–676 (10th Cir. 1949). See United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 555–559, 84 S. Ct. 909, 11 L.Ed.2d 898 (1964).

90. Award 282, § III, pt. B, ¶ B(3), 41 L.A. 679 (1964). See Reynolds v. Denver & R. G. W. R. Co., supra note 89, 174 F.2d at 675.