The **MOTOR CONVOY, INC.**, National Trucking Company, and Florida Convoy, Inc., Plaintiffs,

v.

The **UNITED STATES** of America and the Interstate Commerce Commission, Defendants,

National Automobile Transporters Association and Dixie Transport Company, Intervening Defendants.

Civ. A. No. 8872.

United States District Court
N. D. Georgia,
Atlanta Division.

Oct. 2, 1964.

As Amended on Denial of Rehearing
Nov. 25, 1964.

Paul M. Daniell, Robert E. Born, Watkins & Daniell, Atlanta, Ga., for plaintiff, The Motor Convoy, Inc.

Martin Sack, Sack & Sack, Jacksonville, Fla., for plaintiff, National Trucking Co.

Norman J. Bolinger, Schwartz, Proctor & Bolinger, Jacksonville, Fla., for plaintiff, Florida Convoy, Inc.

William H. Orrick, Jr., Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Charles L. Goodson, U. S. Atty., Atlanta, Ga., for defendant, United States.

Robert W. Ginnane, Gen. Counsel, I. K. Hay, Deputy Gen. Counsel, Betty Jo Christian, Atty., Interstate Commerce Commission, Washington, D. C., for defendant, Interstate Commerce Commission.

George S. Dixon, Matheson, Dixon & Bieneman, Detroit, Mich., R. J. Reynolds, Jr., Atlanta, Ga., of counsel, Reynolds & Reynolds, Atlanta, Ga., for intervening defendant, Nat'l. Auto. Transporters Assn.

Harry G. Kincaid, Knight, Kincaid, Poucher & Harris, Jacksonville, Fla., for intervening defendant, Dixie Transport Co.

Before BELL, Circuit Judge, and HOOPER and MORGAN, District Judges.

PER CURIAM.

This is an action brought to enjoin, annul and set aside Orders of the Interstate Commerce Commission in Docket No. MC–88300 dated October 7, 1963, January 20, 1964, February 20, 1964 and Certificate of Public Convenience and Necessity No. MC–88300 issued to Dixie Transport Company on March 11, 1964.[1]

1. Petitioner complains that the Commission issued said certificate without giving opportunity for protestants to introduce evidence in opposition thereto. The material facts in the record are stated below.

Prior to October 15, 1962 Dixie Transport Company held authority from the Interstate Commerce Commission for the interstate transportation of automobiles and trucks from their place of manufacture in Michigan to destinations in Florida and Georgia, excepting certain named counties. Dixie therefore must be classified as an "initial carrier" pursuant to Administrative Ruling #75 issued by the Commission in 1938 and providing as follows:

> "The term 'Initial Movements' means transportation of *new motor vehicles* from a place of manufacture or assembly, specifically authorized to be served as a point of origin by the originating carrier's certificate or permit, to any point or place upon the authorized route or within its defined territory for delivery to consignee or to a connecting carrier.

> "The term 'Secondary or Subsequent Movements' means transportation of motor vehicles, *except transportation of new motor vehicles from a place of manufacture or assembly,* by a carrier to, from, and between all points and places upon its authorized route or routes or within its authorized territory for delivery to consignee or connecting carriers. Such movements also include cross movements, back hauls, and movements to and from body and specialty plants upon the route or routes or within the authorized territory of the carrier." (Italics supplied.)

With the new and modern methods of transporting new automobiles Dixie Transport Company found its revenues were taking a substantial slump. It therefore applied to the Commission for a modification of its certificate so as to entitle petitioner to transport such automobiles only from Atlanta, Georgia and Jacksonville, Florida to the same points in Florida and Georgia as covered by its original certificate, but permitting the shipments from Michigan to Atlanta and Jacksonville to be made by rail by use of "trailer on flat car" (TOFC) service (sometimes referred to as "rail piggy-back" or by "multi-level rail car" (ML RC). The Commission properly took cognizance of the fact that the two methods of transportation just referred to had caused a substantial trend from motor transportation to rail transportation. It accepted the affidavit from Dixie Transport Company showing that this trend had caused Dixie a substantial loss in income, although Dixie had previously expended considerable sums of money in preparing to exercise its rights under its certificate. The truthfulness of said affidavit was not controverted in these proceedings.

The Commission did in fact decline to have a hearing upon the question of convenience and necessity in connection with Dixie's proposed transportation of new automobiles from Atlanta and Jacksonville to various dealers in the area involved. This Court fails to find in the record however any statement as to the nature of the testimony which protesting carriers desired to introduce before the Commission, nor does this Court find any résumé or statement of the same in the briefs filed in this case. This omission will be discussed hereinafter.

The reason why the Commission did not entertain further evidence cannot be understood without a careful reading and study of the Order entered October 15, 1962 in the matter of "National Automobile Transporters Association Petition for Declaratory Order No. MC–C–3024." That proceeding was brought by National Automobile Transporters Association (NATA) seeking a declaratory order interpreting Administrative Ruling #75 quoted above,

> "and grants of motor carrier operating authority which follow that ruling, particularly insofar as the meaning of the terms 'initial' and 'secondary' movements as used in such authorities are concerned."

NATA is an intervenor in this action and all other parties to this action were also parties before the Commission in the above proceeding, hereinafter referred to as the "NATA proceeding."

In NATA at page 409 the following language appears:

"The original issue presented by petitioner is whether a motor carrier authorized to handle initial movements of motor vehicles may accept such traffic at an authorized point of manufacture or assembly and, without obtaining additional authority, transport it to any point in its initial movement territory by utilizing rail TOFC service, or any comparable rail service, for some intermediate portion of the movement. If such delivery of an initial-movement shipment to a rail point of service does not constitute an interchange which ends the initial nature of the haul, then the initial hauler would be able to effect substitution without additional authority to and from the intermediate points."

The same question was elsewhere stated in the following language:

"This petitioner seeks a ruling as to whether a motor carrier holding initial authority only from A to D may transport the said traffic to B, a nonservice point intermediate to D, there load it on a rail flatcar, for handling in trailer-on-flatcar or 'piggyback' service to C, another nonservice point intermediate to D, where it would take possession of the shipment and move it to destination, without first obtaining specific authority either to serve B and C or to operate from C to D."

The Commission ruled that a carrier holding initial authority could perform the type of operations described above. As pertinent to the instant case, however, the Commission further ruled (91 M.C.C. at 413):

"Similarly in those instances where a railroad or, as an example, motor carrier 'A', originates the traffic, motor common carrier 'B' cannot pick up the traffic from the rail unloading point under its initial authority but must possess appropriate secondary authority from the rail unloading point for delivery to ultimate destination. * * *"

The undisputed facts in the instant case bring Dixie Transport Company squarely within the above stated circumstances for Dixie was a motor carrier authorized to handle initial movements of motor vehicles from Michigan to Georgia and Florida, and it did desire "in those instances where a railroad * * * originates the traffic" to "pick up the traffic from the rail unloading point * * * for delivery to ultimate destination."

The Commission in the NATA case ruled:

"The use by motor carriers of TOFC substitution permits each mode of transportation to best utilize its inherent qualities to provide shippers and the public generally with an efficient and economical service. This Commission has encouraged such transportation developments in the past, and there is no reason at this point to further question the legality of a method of operation long used by the industry and recognized by the Commission's decisions and regulations."

Having made the above ruling the Commission considered the manner in which it would be implemented in the future and ruled: (see M.C.C. 415):

"A great burden would be placed upon applicants, protestants, and this Commission by the filing of individual motor carrier applications for appropriate authority where modifications of existing rights are necessary as a consequence of the interpretation made herein. Under the circumstances presented here, however, the same result may be accomplished by the filing of appropriate petitions to modify existing operating authorities so that the initial carrier may continue to participate in traffic in those instances where initial authority, as here interpreted, does not cover the movement. Such a petition should be filed in the same docket number in

which the initial authority has been granted *and would be considered in the same light as an application filed under section 207(a) of the act."* (Emphasis supplied)

Plaintiffs in this action lay great stress upon the italicized language above contending with great force that the Commission in the Dixie application matter did not consider the same "in the same light as an application filed under section 207(a) of the act," contending that said section 207(a) requires a full hearing followed by complete Findings of Fact showing convenience and necessity. A strict and literal interpretation would no doubt sustain this contention of the plaintiffs. Viewed, however, in the context of the facts in the record and the entire Order of the Commission in the Dixie application we find such criticism to be unmerited for reasons stated below:

Reduced to its simplest terms the situation is this: Dixie Transport Company had the authority to transport new automobiles from Michigan to all points in Florida and Georgia with the exception of certain named counties. In making such transportation it performed all of the hauling and received all of the revenue, and the protesting carriers received nothing. Dixie's application for modification only sought the right to permit railroads to do a part of its hauling, to-wit, from Michigan to Atlanta and Jacksonville, permitting Dixie to transport the automobiles the rest of the way. The need for the transportation by Dixie had previously been established and Dixie had already been supplying that need, and continued to supply that need just as before with the exception of the substitution of rail carriage in lieu of motor carriage for part of the way.

The status of the complaining carriers would not be affected by the situation aforesaid, for as long as Dixie continued to be selected by the shippers to perform this service they could not obtain it. On the other hand, to deny Dixie the modification sought would mean that Dixie, which had the right to transport the cars all the way, would then be prevented

from substitute rail carriage for motor carriage a part of the way, an improved procedure found by the Commission to be decidedly in the public interests.

We are not ruling that the Commission was compelled to grant Dixie's application, but only that it was authorized in so doing, nor do we wish to set an unfortunate precedent for future applications wherein it might clearly appear there is relevant testimony that should be considered by the Commission.

Counsel will present a judgment in accordance herewith.