**UNITED TRANSPORTS, INC., Plaintiff, and**
**Auto Convoy Co., Intervening Plaintiff,**
**v.**
**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

Civ. No. 65–118.† *

United States District Court
W. D. Oklahoma.

Sept. 9, 1965.

Restraining Order and Order
Consolidating Cases Filed
Oct. 5, 1965.

James W. Wrape, and Robert E. Joyner, Wrape & Hernly, Memphis, Tenn., and Washington, D. C., and Larry Hartzog, Oklahoma City, Okl., for United Transports, Inc., plaintiff.

Reagan Sayers, and Rawlings, Sayers, Scurlock & Eidson, Fort Worth, Tex., for Auto Convoy Co., intervening plaintiff.

A. Paul Murrah, and Mosteller, Andrews & Mosburg, Oklahoma City, Okl., for United Transports, Inc. and Auto Convoy Co.

†RESTRAINING ORDER

Pursuant to the authority contained in Section 2324, Title 28 United States Code, it is ordered that the temporary restraining order heretofore entered in the above captioned cases (now consolidated for all purposes) on September 9, 1965, be and the same hereby is continued in full force and effect until final determination of an appeal to the Supreme Court of the United States from the judgments entered herein, and for so long as said appeal is pending.

Dated this 30th day of September, 1965.

JOHN C. PICKETT, Circuit Judge, LUTHER BOHANON, EDWIN LANGLEY, District Judge.

\* ORDER CONSOLIDATING CASES

Upon application having been made by the plaintiffs in the above captioned causes, and said cases having presented identical issues and having been consolidated for purposes of trial, it is ordered that the above captioned causes be and the same hereby are consolidated for all purposes.

Dated this 30th day of September, 1965.

JOHN C. PICKETT, Circuit Judge, LUTHER BOHANON, EDWIN LANGLEY, District Judge.

Donald F. Turner, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, and B. Andrew Potter, U. S. Atty., for the United States of America.

Robert W. Ginnane, General Counsel, and Robert S. Burk, Washington, D. C., for Interstate Commerce Commission.

Donald W. Smith and Smith & Smith, Indianapolis, Ind., and W. T. Brunson and Charles D. Dudley, Oklahoma City, Okl., for Commercial Carriers, Inc., intervening defendant.

Before PICKETT, Circuit Judge, and BOHANON and LANGLEY, District Judges.

LANGLEY, District Judge.

The purpose of this action is to set aside an order of the Interstate Commerce Commission entered in its Docket No. MC–43038 (Sub. No. 404), Commercial Carriers, Inc., Petition for Modification of Existing Certificate.

Commercial Carriers, Inc., of Romulus, Michigan, is the holder of a Certificate of Public Convenience and Necessity issued by the Interstate Commerce Commission under which it is authorized to engage in the transportation of automobiles in interstate commerce as a com-

mon carrier by motor vehicle, limited, however, to the initial movements in truckaway service of new automobiles from the site of the Cadillac factory in Detroit to points in Texas. The order complained of here authorized the modification of the certificate to include the secondary movements of new automobiles in truckaway service from Irving and Floydada, Texas, to points in Texas, but restricted "to traffic originating at the site of the Cadillac Motor Car Division of General Motors Corporation at Detroit, Michigan, and having an immediately prior movement by rail".

The objection of the plaintiff, United Transports, Inc., of Oklahoma City, Oklahoma, and of the intervening plaintiff, Auto Convoy Company, of Dallas, Texas, is that the modification order is in effect an authorization for a new certificate and should not have been issued except upon a showing and finding of present or future public necessity for the additional service in the area, as provided in Section 207(a) of the Interstate Commerce Act (49 U.S.C. § 307(a)), and after an opportunity had been afforded, as required by Section 7(c) of the Administrative Procedure Act (5 U.S.C. § 1006 (c)), to present oral evidence in opposition to the application and to cross-examine witnesses.

The evidence before the court is the record of the Interstate Commerce Commission in its said Docket No. MC–43038 (Sub. No. 404). The record was introduced at the hearing by agreement of all the parties. No other evidence was introduced or offered by any of the parties. It appears from this record, no pertinent factual statement of which is denied by any litigant herein, that in May, 1963, Cadillac began shipping its cars to Texas by rail, terminating the shipments at railheads in Irving and Floydada, and that as a consequence Commercial Carriers, Inc. lost all or virtually all of this traffic to Texas. It therefore applied to the Commission, pursuant to the principles and under the procedures established by the Commission in its order entered in National Automobile Transporters

Assn.—Petition for Declaratory Order, 91 MCC 395, for a modification of its existing certificate to permit it to recapture part of its lost traffic by authorizing the secondary movement of Cadillacs from these railheads to points in Texas. United Transports, Inc., opposed the application before the Commission on the grounds that it was authorized under its certificate to transport such vehicles between points in Texas, that it was furnishing satisfactory service and had invested heavily in facilities and equipment to that end, that no additional carriers were needed or likely to be needed to provide adequate service, and that if the certificate modification applied for was granted it would suffer substantial loss; and demanded an oral hearing. Upon these facts, and without affording the hearing demanded, the Commission entered its order authorizing the modification. The basis upon which the modification was authorized, in addition to the record before the Commission, is set out in the order as follows:

"It further appearing, that in its report and order in National Auto Transporters Assn.—Declaratory Order, NATA, 91 M.C.C. 395, (decided October 15, 1963), the Commission *inter alia,* (a) determined that motor carrier holders of 'initial' and 'secondary' authority to transport automobiles should be placed in a position to be able to continue to participate in the transportation of certain traffic they enjoyed prior to the advent of trailer-on-flat car and multilevel rail car service, and (b) outlined a procedure for modifying the certificates and permits of such motor carriers; * * *."

The mention in the order of "initial" and "secondary" authorizations has reference to the classification of certificates and permits into "Initial Movements" and "Secondary Movements" authorizations by Administrative Order No. 75 entered by the Commission in 1938. The "initial" certificates covered transportation of new automobiles from the place of manufacture to the points specified,

and the "secondary" certificates covered movements other than initial. When automobile manufacturers began about 1960 to utilize rail transportation to a substantial extent for their shipments, serious problems arose as to the respective rights of "initial" and "secondary" certificate holders. To secure a resolution of the matter by the Commission, the National Automobile Transporters Association filed its petition for a declaratory order. The Commission thereupon made an exhaustive study of the automobile transporters' problems, with numerous interested parties filing pleadings. After concluding that as matters then stood "initial" certificate holders could not under their existing certificates participate in the completion of a shipment of automobiles which began by rail at the factory, the Commission then outlined a method for granting such authority without imposing upon itself and interested parties the burdens incident to the filing of individual motor carrier applications. The procedure established is as follows:

> A great burden would be placed upon applicants, protestants, and this Commission by the filing of individual motor carrier applications for appropriate authority where modifications of existing rights are necessary as a consequence of the interpretation made herein. Under the circumstances presented here, however, the same result may be accomplished by the filing of appropriate petitions to modify existing operating authorities so that the initial carrier may continue to participate in traffic in those instances where initial authority, as here interpreted, does not now cover the movement. Such a petition should be filed in the same docket number in which the initial authority has been granted and would be considered in the same light as an application filed under Section 207(a) of the Act.

> It should be supported, as a minimum, by verified statements showing the volume and routing of movements which the petitioners transported within a reasonable time prior to the change in movement, and the same data with respect to traffic shipped subsequent to the introduction of rail TOFC and multilevel rail movements. Notice of the filing of such petition will be given by publication in the Federal Register, and interested persons will be given an opportunity to reply. If an existing authority is modified, a petitioner will not be required to relinquish presently held authority, but, at the same time, the change in existing rights will be limited so as not to place petitioner in a position to infringe on the operations of existing carriers. This can be accomplished by appropriately restricting any modification in the authority to meet particular circumstances. See, for example, Auto Convoy Co. Ext.— Secondary Movements from Texas, 86 M.C.C. 614. By the framing of appropriate grants of authority, carriers faced with substantial revenue losses due to these radically changed circumstances in the transportation industry, may seek to obtain appropriate reformation of their present operating authority. If the relief sought is confined to modification to correct outstanding authorities only to the extent necessary to enable a petitioner to continue to participate in the remaining motor movement, and not to encroach on the rights of other existing carriers, it may be that such petitions can be disposed of with a minimum of expense and effort for all concerned, and perhaps without oral hearing.

The procedure established in the NATA declaratory order was approved in Motor Convoy, Inc. v. United States, D.C., 235 F.Supp. 250 (1964), which was affirmed on the merits by the United States Supreme Court in a per curiam decision (381 U.S. 436, 85 S.Ct. 1575, 14 L.Ed.2d 692). The facts in that case were similar to those here. Dixie Transport Company, a motor carrier, was au-

thorized to handle initial movements of new automobiles from Michigan to points in Georgia and Florida. It applied to the Commission for and was granted a modification of its certificate authorizing it to complete shipments to these points which began by rail and ended at railheads in those states. The basis upon which the modification was authorized was the loss of revenue resulting from the switch by the automobile manufacturer to rail shipments. In denying the demand by Motor Convoy, Inc., to set aside the order, the court said:

> "We are not ruling that the Commission was compelled to grant Dixie's application, but only that it was authorized in so doing, nor do we wish to set an unfortunate precedent for future applications wherein it might clearly appear there is relevant testimony that should be considered by the Commission."

■■ It is clear, therefore, that the procedure followed by the Commission in authorizing the modification of the "initial movements" certificate of Commercial Carriers, Inc. to include "secondary movements" of its former traffic shipped part way by rail from the factory site, has the sanction of the United States Supreme Court and is not open to question here. To the extent that plaintiffs rest their complaint on the failure of the Commission to afford an oral hearing and to find public necessity for additional service, it is without merit. If they are to prevail it must be because the facts before the Commission did not warrant the action taken or because of relevant testimony or other evidence that should have been considered by the Commission but was not. We find nothing to indicate that any evidence in the record before the Commission was not considered, and nothing to indicate that other relevant evidence was available. In its demand for oral hearing no showing was made by United Transports, Inc. as to what it proposed to develop thereby in the way

of relevant testimony, and the Commission so found. Nor has any such showing been made here.

■■ With respect to the evidence upon which the Commission acted, plaintiffs characterize the Commission as arbitrary, capricious, palpably wrong, and abusive of its discretion in authorizing the modification in the face of the undisputed fact that the service already supplied was satisfactory and sufficient and that to authorize additional, unneeded service would work a serious financial hardship on them. But they overlook or refuse to see that these facts are not determinative. The purpose of the Commission was to provide Commercial Carriers with a means to re-establish part of its lost traffic if it could, following the conclusion reached in the NATA decision that in situations such as this it was in the public interest to do so. And however much they may complain, it is obvious from the record that any gain in the secondary movements of Cadillacs in Texas realized by the plaintiffs had to come at least in part as the result of the loss of traffic by Commercial Carriers— and it is for this lost traffic only that Commercial is being allowed to compete. Nor is it determinative that United Transports has invested heavily in anticipation of its windfall of the traffic lost by initial certificate holders such as Commercial Carriers, and stands now to lose by it. The Commission cannot allow its hands to be tied from acting in what it considers the public interest because of investments made by individual carriers.

The court is of the opinion, therefore, that upon the basis of the facts before it the Commission acted within the procedures and principles established in the NATA decision in entering the modification order. And since it does not appear that it failed to consider any relevant facts in evidence, or to afford a hearing as to any such evidence, plaintiffs' complaint should be dismissed and the order allowed to stand.

BOHANON, District Judge (dissenting).

The able opinion written by the majority of the Court sets forth the pertinent portions of the record before the Interstate Commerce Commission and will not be reiterated in this dissent except perhaps in one or two respects.

I cannot find myself in accord with the legal conclusions reached by the majority of the Court. The majority opinion concurs in the conclusion of the Interstate Commerce Commission that the Order complained of herein is a "modification" of a pre-existing authority of the applicant. The Interstate Commerce Commission by its Order did not modify the pre-existing Order of the applicant, Commercial Carriers, Inc., but granted additional authority.

Commercial Carriers, Inc., had authority to engage in the transportation of automobiles in Interstate Commerce as a common carrier by motor vehicle as an initial carrier of movements in truckaway service of new automobiles from the site of the Cadillac factory in Detroit, to points in Texas. The Order complained of here in no sense modified Commercial Carriers, Inc., authority, but granted additional authority, which is known as "secondary authority" of new automobiles in truckaway service from points in Texas to other points in Texas.

A definition of the term "initial authority" and "secondary authority," as defined by the Interstate Commerce Commission, is as follows:

"The term 'initial movements' means transportation of new motor vehicles from a place of manufacture or assembly, specifically authorized to be served as a point of origin by the original carrier's certificate or permit, to any point or place upon the authorized route or within its defined territory for delivery to consignee or to a connecting carrier.

"The term 'secondary or subsequent movement' means transportation of motor vehicles, except transportation of new motor vehicles from a place of manufacture or assembly, by a carrier to, from, and between all points and places upon its authorized route or routes or within its authorized territory for delivery to consignee or connecting carriers. Such movements also include cross movements, backhauls, and movements to and from body or specialty plants upon the route or routes or within the authorized territory of carrier."

So it is plain to see from the Commission's own definition of initial and secondary movements that they relate to altogether different types of authority.

When the Commission by the Order complained of in this case granted Commercial, the initial carrier, the right to engage also in secondary or subsequent movements, it certainly cannot be said that the Commission modified Commercial's authority, but definitely extended the authority.

The Commission entered this so-called modification order without any evidence whatsoever of a showing of public convenience and necessity therefor. The record which was introduced in this case is absolutely barren of any testimony or evidence showing a public convenience and necessity for the issuance of the certificate complained of. The record is barren of any evidence showing that the protestants in this case were not fit, willing, and able to perform the service granted to Commercial.

There were several protestants to the granting of the certificate to Commercial with requests for hearing before the Commission and the right to produce oral testimony. These requests and these objections were ignored and denied, and the certificate and order complained of here was issued and granted without a hearing, in violation of Section 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a), which in pertinent part provides:

" * * * a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the

application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied."

Thus the grant of Congressional authority gave the Commission the power or the right to grant certificates upon a showing of present or future public convenience and necessity only. There is no showing in this case by any evidence or anything else in the record for the granting of the certificate that the public convenience and necessity required the service. The Order of the Commission merely states: "And good cause appearing therefor;" the complained of order was issued. The record is barren of anything to show "good cause" unless it can be said that the Commission from the record felt that it had a duty to favor Commercial because of purported loss of some of Commercial's business.

I do not intend to reflect upon the Commission, but I can find from the record no other apparent reason.

Furthermore, in addition to the lack of compliance with Section 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a), the Commission refused, upon request of protestants, to grant a hearing as provided by the Administrative Procedure Act, Section 9(b), 5 U.S.C.A. § 1008(b); Section 7(c) of the Act, 5 U.S.C.A. § 1006(c); Section 8(b) of the Act, 5 U.S.C.A. § 1007(b).

The Commission had a lengthy hearing in what is referred to as the "NATA case," and concluded, 91 M.C.C. 415–16, as follows:

"A great burden would be placed upon applicants, protestants, and this Commission by the filing of individual motor carrier applications for appropriate authority where modifications of existing rights are necessary as a consequence of the interpretation made herein. Under the circumstances presented here, however, the same result may be accomplished by the filing of appropriate petitions to modify existing operating authorities so that the initial carrier may continue to participate in traffic in those instances where initial authority, as here interpreted, does not now cover the movement. Such a petition should be filed in the same docket number in which the initial authority has been granted and would be considered in the same light as an application filed under section 207(a) of the act.

"It should be supported, as a minimum, by verified statements showing the volume and routing of movements which the petitioners transported within a reasonable time prior to the change in movement, and the same data with respect to traffic shipped subsequent to the introduction of rail TOFC and multilevel rail movements. Notice of the filing of such petition will be given by publication in the Federal Register, and interested persons will be given an opportunity to reply. If an existing authority is modified, a petitioner will not be required to relinquish presently held authority, but, at the same time, *the change in existing rights will be limited so as not to place petitioner in a position to infringe on the operations of existing carriers. This can be accomplished by appropriately restricting any modification in the authority to meet particular circumstances.* See, for example, Auto Convoy Co. Ext.—Secondary Movements from Texas, 86 M.C.C. 614. By the framing of appropriate grants of authority, carriers faced with substantial revenue losses due to these radically changed circumstances in the transportation industry, may seek to obtain appropriate reformation of their present

operating authority. *If the relief sought is confined to modification to correct outstanding authorities only to the extent necessary to enable a petitioner to continue to participate in the remaining motor movement, and not to encroach on the rights of other existing carriers, it may be that such petitions can be disposed of with a minimum of expense and effort for all concerned, and perhaps without oral hearing.*" (Emphasis supplied.)

The Interstate Commerce Commission has no authority, over objections of a protesting carrier, to grant authority without a hearing where both parties can present their evidence and objections. This is so despite the order of the Commission in the NATA case. If the Commission desires such authority as it has exercised in this case, it must secure it from Congress and not take the authority by enacting its own laws.

The due process clause of the Fifth Amendment as hereinafter quoted requires that claims be appropriately set forth so that they may be open to challenge and opposing evidence, and a hearing be accorded at some stage of the administrative proceeding. Under this Amendment, it is doubtful if Congress has the authority to grant to the Interstate Commerce Commission the authority to issue certificates of convenience and necessity without a hearing to opposing parties who may be injured by the granting of such authority.

In the majority opinion, the Court states:

"Nor is it determinative that United Transports has invested heavily in anticipation of its windfall of the traffic lost by initial certificate holders such as Commercial Carriers, and stands now to lose by it."

The majority of the Court further states:

"The purpose of the Commission was to provide Commercial Carriers a means to re-establish part of its lost traffic if it could."

I feel that these two statements can be clearly answered. In the first one, United Transports has not received a windwall. It had its business and equipment arranged to take care of such traffic as is involved in this action. The only windfall is that Commercial Carriers received a certificate to carry automobiles in secondary movements with the stated purpose to provide Commercial Carriers with means to re-establish part of its lost traffic if it could, and without authority to do so by the procedure it followed.

It is my view that the Commission had no authority, statutory or otherwise, to protect Commercial Carriers because it lost some business. This is a hazard that Commercial Carriers took when it began its business operations. Furthermore, as hereinabove stated, if Commercial Carriers were entitled to the certificate granted, it was required to make a showing of public convenience and necessity, which it has not done, and the Commission was further required, under the authorities hereinbefore stated, to grant the protesting carriers who already had the authority to appear at a hearing, cross examine witnesses of the applicant Commercial, and offer evidence in opposition thereto. The record in the case shows that United Transports, Inc., had an investment in Texas, as shown by its Exhibit A, of $2,930,463, which does not include property not owned by United Transports, Inc., but used in its operation at Houston, Texas, the cost of which was $193,265, and it had a definite right to protect its authority and thus protect its investment.

Amendment 5 to the Constitution provides:

" * * * nor be deprived of life, liberty, or property, without due process of law."

An interesting case involving a license from the Federal Communications Commission is L. B. Wilson, Inc. v. Federal Communications Commission, 83 U.S.

App.D.C. 176, 170 F.2d 793 (C.C.D.C.). The Court at Page 800 said:

"(4) The solution is not found in express terms in the Communications Act. Section 312(b) set forth above is silent on the question whether a hearing shall be granted by the Commission on the issue whether or not (indirect) modification of an outstanding license will be occasioned by the granting of requested facilities to a new station. The section does not in terms provide for such a hearing; neither does it in terms forbid it. The same is true of the Act as a whole. It must therefore be construed. We think that properly construed it contemplates a hearing on the issue stated. We reach this view upon the following grounds:

"(5, 6) First: In the construction of a statute its provisions should if possible be given a reasonable meaning. Unreasonable consequences should be avoided. Cf. United States v. American Trucking Associations, 1940, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345. It would give an unreasonable meaning to the Communications Act, in view of the purpose of the Act and of the Commission's duties under it, to construe it as not contemplating a hearing to an outstanding licensee on the question whether the extension of facilities to another station will constitute an indirect modification of his license. The purpose of the Act is to protect and promote the public interest in broadcasting, but the Act also, as pointed out above, recognizes the private interest of licensees. The Commission is to furnish expertise in the administration of the Act. It would be unreasonable for Congress to deny a hearing to an outstanding licensee on the issue whether or not the extension of facilities to another station will cause objectionable interference within the protected contour of the outstanding license and thereby indirectly modi-

fy the same, but to accord a hearing, as the Act does (as construed by the Supreme Court in the KOA case), on the issue whether or not the public interest requires such modification. Each of such issues, as pointed out above, is of critical importance to both the private and the public interests. The Commission's expertise is needed fully as much for the determination of the one issue as of the other. And for the determination of each of these issues the Commission is equally in need of the presentation of evidence and argument."

And further, at Page 802:

"The due process clause of the Fifth Amendment provides that no person shall be deprived of life, liberty or property without due process of law. An essential element of due process is an opportunity to be heard before the reaching of a judgment. By due process of law is meant 'a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial.' Trustees of Dartmouth College v. Woodward, U.S. 1819, 4 Wheat, 518, 581, 4 L. Ed. 629 (Webster's argument). As said in Galpin v. Page, U.S. 1873, 18 Wall. 350, 368, 21 L.Ed. 959: 'It is a rule as old as the law, and never more to be respected than now, that no one shall be personally bound until he has had his day in court, by which is meant, until he has been duly cited to appear, *and has been afforded an opportunity to be heard.* Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and never can be upheld where justice is justly administered.' (Italics supplied) The Commission is not, strictly, a court, but it has quasi-judicial powers and its proceedings must satisfy 'the pertinent demands of due process.'"

The Court further said, at Page 803 of the opinion:

"It is concluded, in summary of the foregoing, that if the Act be given a reasonable interpretation, an interpretation resulting in equal application, an interpretation in harmony with the Commission's own administrative construction, and an interpretation which will bring the Act into harmony with the Constitution, the Act must be held to contemplate hearings before the Commission on the issue modification vel non of an outstanding license by the granting of facilities to another station."

The Order of the Federal Communications Commission was reversed.

In this connection, see also Brotherhood of Railroad Trainmen v. Chicago, Milwaukee, St. Paul and Pacific Railroad, et al. (D.C.D.C.) 237 F.Supp. 404.

There is no difference in principle between the case at bar and the Wilson case, supra.

For the reasons herein stated, I respectfully dissent.